**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COMMUNITY HOUSE, INC.; MARLENE
K. SMITH; GREG A. LUTHER; JAY D.
BANTA,

        *Plaintiffs-Appellees,*

       v.

CITY OF BOISE, Idaho; BOISE CITY
COUNCIL,

        *Defendant,*

      and

DAVID H. BIETER, Mayor;
MARYANN JORDAN; ELAINE CLEGG;
VERNON BISTERFELDT; DAVID
EBERLE; JEROME MAPP; ALAN
SHEALY; BRUCE CHATTERTON,
Director, Planning and
Development Services; JIM
BIRDSALL, Manager, Housing and
Community Development,

        *Defendants-Appellants.*

No. 09-35780

D.C. No.
1:05-cv-00283-BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
Ted Stewart, District Judge, Presiding

Argued and Submitted
May 24, 2010—Pocatello, Idaho

Filed October 6, 2010

Before: Alex Kozinski, Chief Circuit Judge, Stephen S. Trott
and N. Randy Smith, Circuit Judges.

16767

Opinion by Judge Trott;
Concurrence by Chief Judge Kozinski

**COUNSEL**

Howard A. Belodoff, Idaho Legal Aid Services, Inc., Boise, Idaho, for the plaintiffs/appellees.

Phillip J. Collaer, Anderson, Julian & Hull LLP, Boise, Idaho, for the defendants/appellants.

---

**OPINION**

TROTT, Circuit Judge:

The lawsuit underlying this appeal arises from the City of Boise, Idaho's communal assumption almost twenty years ago of shared responsibility for the care and housing of a vulnerable sector of its population — the homeless.

In connection with the City's legislative objectives, Community House, Inc. ("CHI") leased from the City in 1994 as part of a public/private partnership a building that CHI operated as a homeless shelter and as low-income transitional housing. In 2004, CHI and the City agreed to terminate the lease agreement and CHI's right to manage the building. In 2005, the City leased the building to the Boise Rescue Mission ("BRM"), an organization that operates the facility as a homeless shelter for single men and that includes in its activities Christian religious services and pre-meal prayers. In 2007, the BRM purchased the facility pursuant to an option contained in the lease agreement.

After CHI agreed to terminate its lease but before the City's new lease with the BRM, CHI, along with several individual plaintiffs, filed a civil rights complaint under 42 U.S.C. § 1983 against the City and the Boise City Council, alleging, among other things, that the anticipated lease of the building to the BRM violated the First Amendment's anti-

Establishment Clause and the federal Fair Housing Act ("FHA"). CHI additionally named as defendants the following individuals: (1) David Bieter, the mayor of the City of Boise; (2) Maryann Jordan, Elaine Clegg, Vernon Bisterfeldt, David Eberle, Jerome Mapp, and Alan Shealy, members of the Boise City Council; (3) Bruce Chatterton, the Director of Planning and Development Services; and (4) Jim Birdsall, the Manager of Housing and Community Development.[1]

The City, the City Council, and the individual defendants moved for summary judgment. Of relevance to this limited appeal, the district court denied summary judgment to the individual defendants as a group, determining that they were not entitled either to legislative or qualified immunity. *Cmty. House, Inc. v. City of Boise*, 654 F. Supp. 2d 1154, 1165-66 (D. Idaho 2009) ("*Cmty. House II*"), The court determined that genuine issues of material fact precluded qualified immunity on the Establishment Clause claims, but because the individual defendants did not explicitly raise at that time a qualified immunity defense with respect to the FHA claims, the court did not consider that issue. *Id.*

We are now faced with the second interlocutory appeal in this case. Because the individual defendants appeal from a denial of summary judgment on the basis of immunity, we have jurisdiction pursuant to 28 U.S.C. § 1291 and the collateral order doctrine. *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009).

We hold that Mayor Bieter and the members of the City Council are entitled to absolute legislative immunity for their actions in promoting and approving the lease and sale of Community House to the BRM. Additionally, municipal

---

[1]For convenience, we refer to all of the Plaintiffs-Appellees collectively as "CHI." We refer to Boise City and the Boise City Council collectively as "the City." We refer to the mayor, the Boise City Council members, and the two municipal employees collectively as "the individual defendants."

employees Chatterton and Birdsall as individuals are entitled to qualified immunity because at the time the City approved the lease and sale, a reasonable official would not have known that such actions would violate the Establishment Clause or the FHA. We therefore reverse and remand to the district court for further proceedings consistent with this opinion.

# I

# BACKGROUND

## A.   The History of Community House

Boise, like many other cities, has experienced over time a dramatic increase in its homeless population. The general population of Boise increased by more than 22% in the late 1980s, driving up the local cost of housing. Because Boise's employment opportunities failed to keep up with its growing population, the number of homeless grew quickly. Surveys conducted in the early 1990s showed a 20% increase in the Boise homeless community. As recognized by CHI in its Second Amended Complaint, Boise was in the throes of a "homeless crisis," to which the citizenry responded in dramatic fashion. CHI describes these efforts in Paragraphs 42-46 of its Second Amended Complaint:

> 42. . . . . In 1992, Director Michael Hoffman sponsored actress Sally Fields [sic], to perform a play that raised over $70,000. The Rotary Club of Boise committed $50,000 and $25,000 in in-kind services to address the homeless crisis in Boise.

> 43. In June 1992, the Community Assistance Center, Inc. was incorporated and Bylaws were adopted for the purpose of raising donations to develop a full continuum of programs and services and to address the needs of the homeless and to establish a decent, safe, and sanitary community shelter.

44. In January 1993, the Articles were amended to change the name of the corporation to Community House, Inc. In August 1993, the Articles were amended to clarify the purposes of the corporation.

45. Social service agencies, community leaders, and the corporate community participated in fundraising, including Terry Reilly Health Clinic, Boise City/Ada County Housing Authority, Job Service of Idaho, Idaho Department of Health and Welfare, YWCA, Idaho Vocational Rehabilitation, Social Security Administration, Veterans Administration Medical Center, El-Ada Community Action Agency, United Way of Ada County, Junior League, Child Care Connections, Salvation Army, City of Boise, Boise Police Department, St. Luke's Hospital, Boise Neighborhood Housing Services, Ada County Community Services, Central District Health Services, Channel 7 KTVB, Oppenheimer Development, WestOne Bank, H.W. Morrison Foundation, and FUNDSY.

46. In subsequent years, case and in-kind contributions from individuals and corporations, including Albertsons and Hewlett-Packard, amounted to millions of dollars.

In the early 1990s, the City of Boise formally joined this community effort and began working with CHI to plan, design, and construct a new facility to help meet the needs of the homeless population of Boise. On February 8, 1994, the City Council passed Resolution 12635, which, according to CHI's Second Amended Complaint, "recognized the importance of establishing a facility for homeless and very low income individuals." The Resolution set forth the City's agreement to enter into a partnership with CHI as well. The same day, the City and CHI signed a Memorandum of Understanding ("MOU") to "enter into a cooperative public/private

partnership with the primary objective being to provide housing and comprehensive services for the homeless in our community." The new facility, to be named Community House, would be located in Boise near downtown at the corner of 13th Street and River Street. The parties envisioned that the City would own the building and that CHI would lease it from the City. CHI would operate the facility as "a homeless shelter and resource center . . . [that would] provide emergency, temporary, and transitional housing for homeless families and individuals."

Both the City and CHI contributed to the construction of Community House. The City contributed over $1.6 million in Community Development Block Grant ("CDBG") and Home Investment Partnership Program ("HOME") funds, and CHI contributed nearly $400,000 in private donations and over $650,000 from a loan under the Federal Home Loan Bank ("FHLB") Affordable Housing Program.

On November 1, 1994, the City Council passed Resolution 13056, which approved the lease of Community House to CHI. The City agreed to lease the building for $1 per year for fifty years, to keep and maintain the facility in good condition, and to make needed repairs.

On November 30, 1994, the parties entered into an Operating Agreement, in which the City and CHI agreed "to work closely together in developing a comprehensive strategy to resolve the problem of homelessness in the City of Boise." The City granted CHI the right to manage the facility for sixty months, with a renewal term of sixty months. Thus, if renewed, the Operating Agreement would expire by its own terms on November 30, 2004.

Throughout CHI's management, Community House contained an emergency shelter, transitional housing, and single residence occupancy apartments ("SROs"). Residents included men, women, and families. Some occupants paid

rent, and the City realized around $125,000 per year in rental income. From 1995 to 2003, the City gave CHI over $200,000 per year in CDBG and HOME funds to run Community House, totaling more than $2 million. The City and CHI renewed the Operating Agreement after the initial five-year term expired, and CHI managed the building for nearly ten years, apparently without any major disagreements with the City.

Unfortunately, the harmonious relationship between the City and CHI did not last. Disputes began to arise between the parties regarding each other's obligations under the various agreements. In a February 2004 letter to the City, CHI President Deanna Watson described its situation as a "financial crisis," saying, "To put it bluntly, we are just about out of money." In December 2002, CHI fired its executive director. Watson described the City and CHI's business relationship during this time as follows:

> The [C]ity, concerned about the administrative issues and potential legal liabilities, withheld federal subcontracts with the message to the Board, that until it saw adequate progress toward resolution and stability of operations, it would refuse to enter into new binding contracts between the City and Community House.

Enter the Boise Rescue Mission. The BRM is a private Christian organization that has provided services to the homeless in southwest Idaho since 1958. The BRM's chief goal is to "provide food, shelter, and clothing, along with practical programs of education, Christian teaching, and work discipline with the aim of returning the poor, needy, and homeless to society as self-sufficient, productive citizens."

## B.  The City Assumes Management of Community House

In mid-2003, while the City and CHI were still trying to work out their problems, the BRM approached the City about

purchasing Community House, and the City requested that the BRM submit a proposal. On August 1, 2003, the BRM tentatively proposed to operate the building as an emergency homeless shelter; it would also contain single residency occupancy and transitional apartments that would be occupied by those in a year-long substance abuse recovery program or employment program. The BRM stated it would run Community House as a men's shelter, pursuant to its policy of housing men and women separately.

On February 2, 2004, Watson wrote to the City on behalf of CHI, requesting $50,000 in short-term financial help to make it through the month. On February 6, Jan Blickenstaff, the Manager for the City Department of Housing and Community Development, responded to Watson's and CHI's request. Blickenstaff informed CHI that the City had concerns about CHI's solvency, reporting, fiscal controls and compliance, and delinquent audits and reimbursement requests, and he asked CHI to share with the City its plan for solvency. In order for the City to consider the request for funding, Blickenstaff stated, the City would need:

> 1. A business plan that includes cash flow projections and a sources and uses statement for at least the next sixty days. . . .
>
> 2. A disclosure of current payables and delinquency status including insurance, utilities, payroll, taxes, workman's comp insurance, etc. . . .
>
> 3. The staffing plan with position descriptions for the new employees and their résumés. [Please note that fundraising is not an eligible federal grant activity.]

The City and CHI eventually agreed that replacing CHI with a short-term, third-party manager of the building would help keep Community House open. That interim manager would be the Salvation Army. On February 19, 2004, the CHI

Board voted to support the interim plan and to turn over to the City overall operational responsibility for Community House.

The City agreed to "bear all costs and liabilities not covered by the interim management associated with the operation and upkeep of the facility during the interim period." By signing a March 18, 2004 letter from the mayor's office recounting these agreements, Watson agreed that any rents received during this interim period would be paid to the City as reimbursement for the approximately $55,000 that the City had paid to cover CHI's expenses. The CHI Board also agreed with the City that a committee should be formed to "provid[e] input and expertise in developing a permanent plan for management of the facility."

This interim solution, however, was short-lived. The Salvation Army did take over control of Community House but, for reasons unclear from the record, left after only two weeks. For the next year and a half, the City itself operated the facility, spending around $80,000 per month to keep Community House up and running.

## C.   The Advisory Committee

As agreed, the mayor formed the Community House Ad Hoc Advisory Committee ("Advisory Committee") to "explore strategies that may enhance the role and mission of Community House." The Advisory Committee's goal "was to develop recommendations that could assist the City of Boise address future challenges of homelessness and provide a new framework for defining the potential contributions that Community House could make to this effort." There were six members of the Advisory Committee with a wide variety of backgrounds: (1) Uwe Reischl, a university professor and Chair of the Advisory Committee; (2) Greg Allen, an architect; (3) Jill Dunn, a corporate manager; (4) John Traylor, a county executive administrator; (5) Mike Wilson, a health care advocate; and (6) Deanna Watson, President of CHI.

The Advisory Committee issued its report to the City and the mayor on May 6, 2004. Recognizing that homelessness is "an enduring presence in American society" and that the homeless "are often forced to use community services and public resources in very inefficient and costly ways," the Advisory Committee suggested that the City re-examine the role of Community House as both an emergency homeless shelter and a low-income transitional facility. Instead of continuing as a mixed-use facility, the Advisory Committee recommended that Community House function "as an asset in meeting basic emergency needs of the homeless in the City of Boise." The Advisory Committee advised also that sharing emergency shelter services with organizations such as the BRM, the Salvation Army, and local churches might be beneficial. The report recognized that the sale of Community House ought to be considered. The report was not intended to be binding on City officials, but to help Mayor Bieter "in evaluating [the City of Boise's] alternatives for Community House in the future."

## D.    The Lease and Sale of Community House to the BRM

In June 2004, the City and CHI entered into a new contract, a Management Agreement, which terminated CHI's lease and the Operating Agreement and transferred to the City all assets of Community House. The parties agreed that the City would pay all management costs from March 2, 2004 "until the programs are transferred to other entities," manage Community House until a long-term plan could be developed, and take over responsibility on the FHLB loan.

Undaunted, the City began exploring its options for such a plan in early 2005, when it published a Request for Interest/Request for Proposal ("RFI/RFP"). The RFI/RFP sought proposals from any party interested in direct management or ownership of three facilities and programs: Community House, the soup kitchen run out of Baltes Community Café, and MelloDee Thornton Childcare Center.

Phase 1 proposals were due March 7, 2005. Responding parties were required to explain their interest, describe the team that would implement the plan, and discuss "funding and other resources necessary to transition the services and provide them on an ongoing basis." A short list of organizations would then be invited to submit Phase 2 proposals, which were to contain timetables, funding sources, proposed budgets, and a detailed staff and management plan.

The City received Phase 1 proposals from several organizations, including the BRM, Giraffe Laugh Day Care, Supportive Housing and Innovative Partnerships, Inc. ("SHIP"), and El Ada, Inc. On February 25, 2005, CHI submitted a very short proposal stating that "Boise City . . . must be [an] ongoing funding partner[ ] beyond the distribution of federal grant money," but it did not actually contain any funding information. CHI submitted a more complete proposal on April 17, 2005, six weeks after the Phase 1 deadline. In this document, CHI proposed "to operate the Community House facility as it was originally envisioned with some alterations."

The BRM proposed to renovate Community House into a shelter for single men, who were at the time housed at the BRM's facility on Front Street. If the City accepted, the proposal would require the City to negotiate exclusively with the BRM. Apparently concerned with the BRM's men-only policy and its religious services, Chatterton, the Director of City Planning and Development Services, asked for more information on these issues. In a May 11, 2005 letter, he requested clarification on how the BRM's policies would affect the "emergency shelter services" that the BRM proposed to operate at the facility. He asked for statistical and other information on the BRM's women's shelter. Chatterton also informed the BRM that the City could not negotiate exclusively with the BRM for the purchase of the facility at that time because a public auction was required by state statute.

In response to Chatterton's letter, the BRM assured the City that the shelter was available to anybody, "regardless of their

religious affiliation." The BRM also explained why its male guests slept in the Front Street shelter, while women and children slept at the City Light shelter:

> The homeless population is [a] difficult population to serve under any circumstance. The problems are exacerbated in a mixed gender shelter environment. Further, it is not always appropriate to have families, particularly families with young or vulnerable children, to sleep in the same facility as other members of the homeless population. We believe that our separate shelter facilities for men and women is one of the reasons why we have fewer police calls at our facilities than Community House.

Defendant Chatterton called the Boise City Police, verified that the Front Street shelter had nearly 60% fewer police calls than Community House, and passed this information on to the City Council.

On May 31, 2005, the City informed the BRM that it could not accept its proposal at that time. Because the proposal contemplated a sale of Community House, the City described the steps it would have to take if it decided to sell the property and stated that the City Council would soon be voting on a resolution to move forward pursuant to those requirements.

In compliance with Idaho law, the City Council passed Ordinance 6402 on June 29, 2005, which represented a superseding policy approach to this issue. The Ordinance did three things. First, the ordinance set forth the City's decision, as required by section 50-1401, to declare Community House surplus property that was underutilized by the City and no longer necessary for public purposes. The City gave the following reasons for its decision: (1) the City's core mission did not include providing emergency shelter services; (2) there was a shortage of emergency shelters in the Boise area, and use of Community House as an emergency shelter "could

meet the needs of the community"; (3) a private entity trained to manage an emergency shelter would be better able to manage the facility as an emergency shelter; and (4) converting the property to a use that was "within the core mission of the City" would cost more than the City could pay.

Second, as required by section 50-1402, the City set a minimum value for the property: $2.5 million.

Third, the City placed a deed restriction on the property which reflected its continuing formal concern for the homeless, a restriction which required that the facility be used for ten years "as a soup kitchen and shelter for the homeless." On July 12, 2005, the City amended the deed restriction by passing Ordinance 6404. Ordinance 6404 required that the property be used for ten years as a soup kitchen and as "a shelter for a minimum of 66[ ] single, homeless[ ] men, ages[ ] 18 years or older." This Ordinance reiterated the City's intent to ensure the existence of a shelter for the homeless, saying, "There is a shortage of structures designed as emergency shelters. Therefore, while the structure would be underutilized by the City, it could meet the needs of the community if it was surplused." Moreover, Ordinance 6404 required that the building be operated in a manner designed to protect "the immediate neighborhood and the community as a whole" from harm and from loitering.

As required by sections 50-1402 and 50-1403, the City published a notice of sale, informing potential bidders that the auction would take place on July 15, 2005. Before the auction the BRM informed the City that it was not planning to bid but that it would consider purchasing the property later if "the price and terms of purchase [are] acceptable."

On behalf of CHI, then-President Sue Cobley made the only bid at the auction. CHI offered to buy the property for $2.5 million of its "equitable ownership interest" in Community House, including its fixtures and improvements, personal

property, and accounts. Cobley alleged in an affidavit that "auction officials accepted the Community House Inc. bid at the auction," but that in a July 26, 2005 meeting, "the City Council rejected the bid, and refused to complete the transfer in accordance with the Ordinance requirements." Chatterton stated in a memorandum to the mayor and council members that CHI's bid "was non-conforming to the auction requirements" and recommended the Council find there were no responsive bids at the auction. Chatterton stated, "CHI has not demonstrated that they have 'equitable interest' in the Community House property" sufficient to pay for the facility.

Acting within its lawful authority under section 50-1403, the City decided to negotiate a lease, including a purchase option, with the BRM. In those negotiations, the BRM wanted the same $1 rent that CHI had had, while the City asked for market rate. The BRM initially asked for an option price of $1.8 million.

The City and the BRM executed a lease on September 2, 2005. The initial lease term was less than a year, with nine renewal terms of one year each. At first the BRM would pay $1 per year in rent, which would escalate to market rent after five years. The option price was $2 million if exercised by March 31, 2007. After that date, the price increased to around $2.7 million. The City retained no power to exercise any management or control over the BRM or the facility.

Section 5.2 of the lease required the BRM to use the facility as an emergency homeless shelter and a soup kitchen. Although these were the only two services the lease required, the BRM was authorized to use the building in other ways, such as "general residential uses" and programs for substance abuse recovery. Minutes of a BRM Board of Directors meeting show that by August 9, 2005, the BRM was still considering charging rent for "SROs on the top floor."

The City Council formally adopted Resolution 18765, which approved the lease to the BRM. The Resolution

required that the BRM operate the facility "on the terms generally set forth in Boise City Ordinance No. 6404," which contained the single-men-only restriction. The City closed Community House on September 6, 2005. The BRM reopened the facility in October and renamed it the River of Life Rescue Mission.

The City repaid CHI's outstanding FHLB loan and, "by doing so, obtained a release of liability on behalf of both the City of Boise and CHI." The BRM exercised its purchase option on January 9, 2007.

### E.   Litigation

CHI filed suit the same day as the auction in July 2005. The district court denied in part its request for a preliminary injunction, but a previous panel of this court reversed and remanded for reconsideration. *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041 (9th Cir. 2007) ("*Cmty. House I*").

The initial question in the previous appeal was whether the FHA, which applies only to "dwellings," applied to Community House. *Id.* at 1048 n.2. We noted that the Ninth Circuit had "never squarely addressed the issue of whether all temporary shelters fit within the [FHA's] definition of 'dwelling,' " but did not decide the issue. *Id.* Based on evidence that Community House (under CHI's control) generated up to $125,000 in annual rent from the transitional housing units and SROs, in which the occupants resided for up to a year and a half, we had "little trouble concluding that at least part of the facility" was intended as a residence and that therefore the FHA applied. *Id.*

We held that, because the single-men-only requirement contained in Ordinance 6404 was facially discriminatory, CHI had made out a prima facie case of intentional discrimination. *Id.* at 1050. Recognizing that the FHA does not prohibit every intentionally differential treatment and that "[w]e ha[d] not

previously adopted a standard for determining the propriety or acceptability of justifications for facial discrimination under the [FHA]," we followed the formulation espoused by the Sixth and Tenth Circuits:

> To allow the circumstance of facial discrimination . . . a defendant must show either: (1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected, rather than being based on stereotypes.

*Id.* The only evidence the City had submitted regarding safety concerns was an affidavit from Roscoe asserting that there were fewer police calls at the BRM's single-sex facilities than at Community House. *Id.* at 1051. Although this was insufficient at the time to satisfy our newly-adopted analysis for facially discriminatory policies, we recognized that, "at a later stage in this litigation, the City may be able to provide evidence to establish that its men-only policy is indeed justified by legitimate safety concerns." *Id.*

We held also that CHI's Establishment Clause allegations — that the lease and sale of Community House to the BRM constituted religious indoctrination by the government — were sufficient to support a preliminary injunction. *Id.* at 1059.

CHI then filed a Second Amended Complaint on December 28, 2007. On July 29, 2009, the district court granted summary judgment to all of the defendants on CHI's claims under the Due Process Clause, the Uniform Relocation Assistance and Real Property Acquisitions Policy Act, and the Home Investment Partnership Act. *Cmty. House II*, 654 F. Supp. 2d at 1165, 1172. In addition, the district court granted the defendants summary judgment on CHI's FHA claims for religious discrimination and disparate treatment based on disability. *Id.* at 1168-71. Those rulings are not before us.

The court denied summary judgment to the City and the individual defendants on CHI's remaining FHA, Establishment Clause, and Idaho constitutional claims. With respect to the individual defendants, the district court held that neither legislative nor qualified immunity applied and denied them summary judgment.

## II

## STANDARD OF REVIEW

We review de novo a district court's decision to deny summary judgment based on legislative or qualified immunity. *Kaahumanu v. County of Maui*, 315 F.3d 1215, 1219 (9th Cir. 2003); *Mabe v. San Bernardino County*, 237 F.3d 1101, 1106 (9th Cir. 2001). We apply the same summary judgment standard as the district court. *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003).

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Because the issues presented here on summary judgment are "purely legal ones," we need decide only "whether the district court correctly determined that, under the facts alleged, [CHI's] claims were barred as a matter of law." *Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1250 (9th Cir. 1982). We accept those facts and reasonable inferences to be drawn from them in the light most favorable to CHI.

## III

## LEGISLATIVE IMMUNITY[2]

---

[2]CHI argues perfunctorily that we should not consider the legislative immunity question because the individual defendants "did not assert legis-

**[1]** Local government officials are entitled to legislative immunity for their legislative actions, whether those officials are members of the legislative or the executive branch. *Bogan v. Scott-Harris*, 523 U.S. 44, 54-55 (1998). This immunity extends both to claims for damages and claims for injunctive relief. *Supreme Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732-33 (1980). Accordingly, we must decide whether the lease and sale of Community House to the BRM was an act within the sphere of legislative activity. *Bogan*, 523 U.S. at 54.

## A.    The Members of the City Council

**[2]** Although monitoring or administrating a municipal contract is generally an executive function, whether an act is legislative depends not on defined categories of government acts but on "the character and effect" of the particular act at issue. *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 580 (9th Cir. 1984). Moreover, the question of the intent of the individual defendants is strictly off-limits in the legislative immunity analysis. As instructed by the Supreme Court, our inquiry into whether the officials' actions were legislative must be "stripped of all considerations of intent and motive." *Bogan*, 523 U.S. at 55.

> The privilege would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of a pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.

*Tenney v. Brandhove*, 341 U.S. 367, 377 (1951).

---

lative immunity in their Answer." CHI's one-sentence argument on how it was prejudiced is woefully insufficient, and CHI has waived the argument by failing adequately to brief it. *Aramark Facility Servs. v. Serv. Employees Int'l Union, Local 1877*, 530 F.3d 817, 824 n.2 (9th Cir. 2008).

We consider four factors in determining whether an act is legislative in its character and effect: "(1) whether the act involves ad hoc decisionmaking, or the formulation of policy; (2) whether the act applies to a few individuals, or to the public at large; (3) whether the act is formally legislative in character; and (4) whether it bears all the hallmarks of traditional legislation." *Kaahumanu*, 315 F.3d at 1220 (citation and internal quotation marks omitted). The first two factors are largely related, as are the last two factors, and they are not mutually exclusive. *Kaahumanu*, 315 F.3d at 1220; *San Pedro Hotel v. City of Los Angeles*, 159 F.3d 470, 476 (9th Cir. 1998).

**[3]** The third and fourth factors are easily satisfied in this case. The district court acknowledged, and CHI does not dispute, that the City's actions were formally and indisputably legislative in character. *Cmty. House II*, 654 F. Supp. 2d at 1166. In an attempt to sell Community House at the public auction, the City Council passed Ordinances 6402 and 6404. Ordinances must be passed by majority vote, must be published in a city's official newspaper, and must generally be read on three different days. Idaho Code §§ 50-901, 902.

In addition to the Ordinances, throughout the period the City was involved with Community House, the City Council passed at least three resolutions: Resolution 12635, which announced the City's partnership with CHI, Resolution 13056, which approved the lease to CHI, and Resolution 18765, which approved the lease to the BRM. Council Resolutions must also be passed by majority vote and, like ordinances, are binding. Idaho Code § 50-902. Resolutions, however, are not subject to the same publication and reading requirements as ordinances. *See id.* The City's actions were formally legislative and bore all the hallmarks of traditional legislation that implemented City policy.

**[4]** We next consider whether the City's actions applied to merely a few individuals or to the public at large. The district court held that the City's lease and sale of Community House

to the BRM affected only "CHI, the City, the BRM, and the residents of Community House." *Cmty. House II*, 654 F. Supp. 2d at 1166. With respect, that conclusion was manifestly erroneous. First, the lease and sale actually had an impact on a larger group of people — Boise's homeless community. An act need not affect a city's entire population in order to be considered legislative. It is sufficient that the act affects a discrete group of people or places. *See Kaahumanu*, 315 F.3d at 1220 (enactment of a zoning ordinance, unlike the denial of a conditional use permit, is generally a legislative act because it affects "all parcels within the covered area").

**[5]** The unchallenged facts arrayed in Part I, sections A, B, C, and D of this opinion demonstrate that the disputed lease and sale were an inseparable part of the City's longstanding and continuing attempt to ameliorate a serious community problem, indeed a city "crisis." CHI's Second Amended Complaint itself describes a city-wide problem to which many private as well as public interests responded. CHI would ask us to put on blinders to the context which spawned the sale and lease. Only were we to ignore everything leading up to the dispute could we conclude that the lease and sale affected merely a few people.

Our final consideration is whether the actions of the mayor and council members involved the formulation of policy or were merely ad hoc decisions. An "ad hoc" decision is made "with a particular end or purpose," as distinguished from "a coordinated policy." *Webster's New International Dictionary, Unabridged* 26 (2002). Budgetary decisions, such as a decision to eliminate an employment position, typically involve the formation of policy. *See Bechard v. Rappold*, 287 F.3d 827, 830 (9th Cir. 2002). On the other hand, decisions directed toward specific individuals, such as a decision to indemnify a government employee, are normally considered to be ad hoc. *Trevino v. Gates*, 23 F.3d 1480, 1482 (9th Cir. 1994).

Once again, the fact that the lease and sale to the BRM viewed out of context involved only a single building and parcel of land is not dispositive. We have previously held that a denial of public funds for a loan to a single entity for the purchase of a single hotel "involved the formation of policy applied to the public at large." *San Pedro Hotel Co.*, 159 F.3d at 476. Because the denial of the loan was a discretionary decision on whether to disburse public funds to a certain party, the decision was not ad hoc:

> The disbursement of public funds in support of one project necessarily means that other projects are not being funded. A legislator's decision can almost always be criticized for not funding some worthy group. This is precisely the type of decision for which a legislator must be given immunity. To hold otherwise would expose virtually every municipal funding decision to judicial review.

*Id.* We held that the defendant councilman was "entitled to absolute immunity for voting or persuading his colleagues to vote one way or another on approval of the loan." *Id.*

CHI's attempt to distinguish *San Pedro Hotel* is wholly unpersuasive. It argues that the mayor and council members "have not produced evidence of any policy to address homelessness that was related to their vote for a facially discriminatory men-only policy and approval of a lease for a below market rent." CHI's cramped formulation of our focus attempts to limit the policy inquiry here only to the men-only stipulation and the rent issue. These two matters are but small subparts of a larger developing universe, and examining the relevant universe and the context of the disputed acts assist us in deciding whether they were essentially legislative or not.

First, the actions of the mayor and council members leading up to and including the lease and sale to the BRM involved questions of whether to continue making "disbursement[s] of

public funds" to CHI. *Id.* The City consistently contributed public resources to assist CHI in the operation of Community House: at least $200,000 per year for ten years. When the City took over management and was forced to funnel $80,000 into Community House each month, it determined — unsurprisingly — that transferring management or ownership would provide a long-term solution. Its decision to lease and eventually sell the facility to an organization that does not receive *any* public funds preserved the City's coffers for other worthy projects.

Second, the City had an ongoing policy, since 1994 at the latest, of helping provide shelter for and services to Boise's homeless community. The MOU clearly states the City's intention to "enter into a cooperative public/private partnership with the primary objective being to provide housing and comprehensive services for the homeless in our community." The City kept looking for a solution that would keep the doors of the shelter open. When it became clear that CHI's financial difficulties were not improving, the City decided to bring in the Salvation Army — with CHI's blessing — to see if a different non-profit group could operate the facility with less difficulty. When the Salvation Army abandoned the project after only 2 weeks, the City itself took over management of Community House. And when a different non-profit organization demonstrated its desire and ability to take over the City's efforts to manage a homeless shelter — which would effectuate the City's policy of caring for the homeless while saving the City money at the same time — the City chose that route.

Finally, the individuals involved in the decision of what to do with Community House had to weigh important social demands inherent in the City's policy of helping the homeless against significant individual rights. Legislators involved in such balancing are generally entitled to absolute legislative immunity. *Kuzinich v. Santa Clara County*, 689 F.2d 1345, 1350 (9th Cir. 1982). In *Kuzinich*, a case involving the enactment of an emergency zoning ordinance, we explained why:

> [T]he manifest need for a rule of absolute immunity is illustrated in this case. Here legislators are involved in balancing social needs against constitutional rights, the kind of balancing which often produces plurality opinions, and almost always dissenting opinions, in the Supreme Court. These legislators now find themselves sued for the total of $2,500,000.00 general damages and $5,000,000.00 punitive damages by a plaintiff whose business, as nearly as we can determine from the record, has not been shut down one day.

*Id.*

**[6]** In other words, it is not the within the province of the courts to second-guess the difficult policy decisions legislators must make simply because a different decision might have been made after weighing the immediate needs of a disadvantaged group of local citizens against the possibility of offending a constitutional or statutory right. The City's ultimate decision in this case unmistakably was not ad hoc. Rather, it was the culmination of the City's repeated efforts to ensure that Boise addressed its homeless crisis and retained a homeless shelter.

CHI casts its fate in large measure with our decision in *Kaahumanu*, 315 F.3d at 1220-24. In that case, we analyzed the Maui City Council's denial of a conditional use permit ("CUP") to an applicant who wished to use for commercial purposes her beachfront property located in an area zoned for residential use. Our inquiry was designed ultimately to determine whether the Council's denial was insulated by the doctrine of legislative immunity from lawsuits brought pursuant to § 1983. Accordingly, we examined whether the denial was administrative with respect to settled zoning policy, on one hand, or whether it had the characteristics of a policy laden legislative decision, on the other. *Id.* at 1220.

Because we concluded that the denial was administrative, we decided that the Council and its members were not entitled to legislative immunity, and we did so for two reasons.

First, the denial was "based on the circumstances of the particular case and did not effectuate policy or create a binding rule of conduct." *Id.*

Second, "[i]n denying a single application for a CUP, the Council did not change Maui's comprehensive zoning ordinance or the policies underlying it, nor did it affect the City's budgetary priorities or the services the County provides to residents." *Id.* at 1223-24. The CUP by its terms applied only to Plaintiff Barker's parcel and did not involve rezoning or an application for rezoning. *Id.* at 1223 n.7.

To articulate our reasoning in that case is to demonstrate that *Kaahumanu* is manifestly distinguishable from the case at hand. Here, the actions of which CHI complains were taken specifically to supersede old policy and to effectuate a new approach to a continuing civic problem for which the City was searching for a remedy. The City's final decision had nothing to do with the rote administration of the existing policy. Unlike the disputed decision in *Kaahumanu*, the discretionary decision here directly affected an important service the City provided to a disadvantaged segment of its residents, and it did so with considerable budgetary implications. *Bogan*, 523 U.S. at 55-56 ("The ordinance [qualifying for legislative immunity for the officials responsible for it] reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents."). In effect, although the Maui City Council is normally a legislative body, its decision to deny an isolated CUP to Barker had all the hallmarks of an ad hoc implementing executive decision, not a legislative one. Thus, we conclude that *Kaahumanu* is distinguishable from both this case, as well as from *San Pedro Hotel* where the public funds aspect of the decision tipped the scales in favor of legis-

lative immunity. *San Pedro Hotel* by itself would be enough to support our decision.

**[7]** In discussing the long-standing tradition of legislative immunity, the Supreme Court has emphasized that the freedom of legislators to make decisions without worrying about personal liability is necessary to protect the *citizens* — not just the legislators:

> These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal.

*Tenney*, 341 U.S. at 373-74 (citation and quotation marks omitted). The decisions about how to further the City's laudable goal of fighting homelessness is a prime example of the need to allow city council members the freedom to make important and difficult discretionary decisions without fear of being personally sued for doing so.

## B. The Mayor

CHI asserts that Mayor Bieter is not entitled to legislative immunity because "[a] mayor is a city's chief administrative official," the "act of signing a public contract is ministerial," and he "did not vote on the Ordinance or lease." This argument ignores the Supreme Court's insistence that the question of whether an act is legislative turns on the nature and character of the particular act, not on any bright-line rule. *Bogan*, 523 U.S. at 54. Indeed, the Court held in *Bogan* that an executive official's introduction of a budget and signing of a local ordinance were legislative acts. *Id.* at 55.

**[8]** Here, the mayor's office participated in the entire legislative process regarding Community House. Members of the

mayor's staff attended various CHI Board meetings to discuss potential solutions to Community House issues. The mayor requested in February 2004 that CHI make a proposal if it needed financial assistance. The Advisory Committee, of which Watson was a member, stated its intent to help Mayor Bieter — not just the City Council members — evaluate the best course of action with respect to Community House. As contemplated by state law, he signed the Ordinances and approved the Resolutions passed by the City Council. *See id.* Because the mayor was intricately involved in the City's policy decision to provide shelter for the homeless, he is entitled to legislative immunity along with the council members, even though he is nominally an executive official.

**[9]** That the mayor and council members knew the BRM was a religious organization and would allow only single men to stay at the shelter does not change our analysis. Courts must be extremely careful that considerations of a legislator's motive do not infect the determination of whether an act is legislative:

> The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators.

*Tenney*, 341 U.S. at 377. "It [is] not consonant with our scheme of government for a court to inquire into the motives of legislators . . . ." *Id.*

The importance of absolute legislative immunity to our system of government cannot be overstated:

> In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and are readily believed. Courts are not the place for

> such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses.

*Id.* at 378 (footnote omitted). For their legislative decisions, legislators are answerable to the citizenry — not to a court of law. The specters of impeachment, recall, lost elections, and criminal prosecution for bribery and other crimes are enough checks against a legislator's malfeasance. As a matter of sound public policy, we must not and should not add personal financial liability to that list.

## IV

## QUALIFIED IMMUNITY

**[10]** In § 1983 actions, the doctrine of qualified immunity protects city officials from personal liability in their *individual* capacities for their official conduct so long as that conduct is objectively reasonable and does not violate clearly-established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Qualified immunity is necessary to "protect[ ] the public from unwarranted timidity on the part of public officials" and to avoid "dampen[ing] the ardour of all but the most resolute, or the most irresponsible." *Richardson v. McKnight*, 521 U.S. 399, 408 (1997) (citation and internal quotation marks omitted). True to these purposes, the qualified immunity standard " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)). "Moreover, because '[t]he entitlement is an *immunity from suit* rather than a mere defense to liability,' we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227 (citation deleted) (emphasis in original). Qualified immunity, however, is a defense available only to government officials sued in their

individual capacities. It is *not* available to those sued only in their official capacities. *Eng v. Cooley*, 552 F.3d 1062, 1064 n.1 (9th Cir. 2009); *Kentucky v. Graham*, 473 U.S. 159, 165-68 (1985).

We recognize that public employees — such as Birdsall and Chatterton — carrying out the express legislative will of a city are ordinarily entitled to rely on its lawfulness. As we said in *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999), "when a public official acts in reliance on a duly enacted statute or ordinance, that official is entitled to qualified immunity." *See also Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994).

As to the *Dittman* / *Grossman* rule, however, the parties hotly dispute the specific role played in this matter by Birdsall and Chatterton. Not unexpectedly, the City says its employees, who "did not vote for or authorize the lease or sale of the building," were unmistakably acting "in furtherance of decisions made by the City Council." CHI, on the other hand, asserts that the City's argument "fails to recognize the primary role [Chatterton and Birdsall] played in wrongful conduct and in developing the plan and advising the Council." During oral argument, CHI's attorney called them the "primary movers" who deliberately and in knowing violation of the law "orchestrated" CHI's demise. CHI refers us in this respect to our qualification in *Grossman* that "[w]here a statute authorizes official conduct which is patently violative of fundamental constitutional principles, an officer who enforces that statute is not entitled to qualified immunity." *Id.* at 1209.

Given this heated dispute, and because we must accept the facts and reasonable inferences in the light most favorable to CHI, we hesitate in these circumstances to apply the *Dittman* / *Grossman* rule. Instead, we examine this immunity issue according to *Saucier*'s second prong: whether the rights allegedly violated were clearly established at the relevant times.

We note here some considerable and perplexing fog in the record. CHI's Second Amended Complaint says in paragraphs 34 and 35 that it pursues defendants Chatterton and Birdsall in their *"official capacit[ies]."* In that event, the principle of qualified immunity would be utterly inapposite. However, the district court's opinion and the parties' briefs and oral arguments give every indication that these defendants are being sued in their *individual* capacities, as the complaint's Preliminary Statement suggests:

> 3. The Plaintiff, CHI, seeks *monetary damages*, declaratory, and injunctive relief against the City of Boise, and *individually named defendants* who are officials or employees of the municipality to redress the Defendant's discriminatory practices and policies, under color of state law . . . .

(emphasis added). Furthermore, the first words from the City's attorney at oral argument were that this appeal is about qualified immunity, which, we repeat has no application to persons sued their official capacities.

The district court's opinion lumps all the defendants together, and, in denying qualified immunity to all, the court makes no distinction whatsoever between defendants in their official capacities and defendants in their individual capacities. Given the rule that qualified immunity covers only defendants in their individual capacities, one can only wonder why the district court denied Chatterton's and Birdsall's request for the same if the court and the parties understood this distinction and viewed these City employees as being sued only in their official capacities. The briefs filed by both parties do not acknowledge or recognize this important principle. Indeed, during oral argument, CHI's counsel manifested an intention to attempt to recover punitive damages from the individual defendants, saying that to leave the City as the only defendant would deprive them of that opportunity:

(By the court)

> Q. Are you looking for money judgments against the individual defendants?

(By counsel for the plaintiffs)

> A. Well, . . . It's not what we are looking for, but the question is the court has to apply the law as to qualified immunity. . . .

> Q. So, you're looking for money judgments against these individuals?

> A. If that's what the evidence reflects and the jury determines that. . . .

> Q. If [the individuals] all disappeared from the case, is there anything you cannot get from the City of Boise in terms of compensatory and injunctive relief?

> A. We may lose punitive damages.

> Q. Against the City of Boise?

> A. Or the individuals. . . .

> Q. Are you going to go after punitive damages if you prevail?

> A. If the evidence shows and the jury agrees, then that's a possibility. . . .

We simply cannot find anything in the record that suggests that either the parties or the district court appreciate the differ-

ence between personal and official capacity § 1983 lawsuits. When asked during oral argument about the capacities of the defendants, CHI's counsel could not recall what was in the complaint. Thus, it is an appropriate time to republish the Supreme Court's explanation of this important distinction.

> Proper application of this [immunity] principle in damages actions against public officials requires careful adherence to the distinction between personal- and official-capacity suits. Because this distinction apparently continues to confuse lawyers and confound lower courts, we attempt to define it more clearly through concrete examples of the practical and doctrinal differences between personal- and official-capacity actions.

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. . . . Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." . . . As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. . . . It is *not* a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Graham*, 473 U.S. at 165-66 (citations and footnotes omitted).

**[11]** This case is here for the second time on an interlocutory basis. The trial is still in the distant future. Therefore,

given the Supreme Court's admonishment in *Hunter v. Bryant* to decide immunity issues as early as possible, *see* 502 U.S. at 227, we "believe it prudent" at this juncture in an exercise of our supervisory power to clear up this apparent confusion now and to address qualified immunity as it relates to Chatterton and Birdsall — which is what both parties ask us to do. *MGA Entertainment, Inc. v. Mattel, Inc.*, ___ F.3d ___, Nos. 09-55673 and 09-55812, slip op. 10540 (9th Cir. July 22, 2010) (Kozinski, C.J.). The record as it stands is ripe and adequate to do so. To fail to do so risks continuing confusion in the district court, a possible new amended complaint, and a trial on issues not properly in the case. Thus, we take counsel for CHI at his word and address the question of qualified immunity as it applies to the Establishment Clause and FHA claims against Chatterton and Birdsall in their *individual* capacities.

A qualified immunity analysis consists of two prongs: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [official's] conduct violated a constitutional right"; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808 (2009). Addressing the two prongs of the test in this order is often beneficial, but it is not mandatory. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

To determine whether a right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act. *See Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). In the absence of binding precedent, courts should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established. *Id.*

This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. For the law to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). It is not necessary that the "very action in question has previously been held unlawful," but "in the light of preexisting law the unlawfulness must be apparent." *Id.* "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable [official] that his conduct was unlawful *in the situation he confronted*." *Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010) (quoting *Saucier*, 533 U.S. at 202) (omission and emphasis in original), *petition for cert. filed*, April 7, 2010. In addition, "[c]ourts have . . . held that the existence of a statute or an ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional." *Grossman*, 33 F.3d at 1209.

## A.  Jurisdiction

CHI argues initially that we lack jurisdiction to consider the qualified immunity issue. Although the district court found — on the first prong of the qualified immunity analysis — that there were genuine issues of material fact regarding whether there had been a violation of the Establishment Clause, the court ended its analysis there. *Cmty. House II*, 654 F. Supp. 2d at 1166. It did not go on to determine the purely legal issue of whether the law was so clearly established that a reasonable official would have known his conduct violated that law — known as the "second prong" of the test. Therefore, goes CHI's argument, our review cannot be separated from the merits of the case, and we have no jurisdiction to consider the issue.

It is true that when reviewing a denial of qualified immunity, "our appellate jurisdiction is limited to questions of

law." *Robinson*, 566 F.3d at 821. However, we have power to consider qualified immunity even where facts are disputed, so long as we "assum[e] that the version of the material facts asserted by the non-moving party is correct." *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001) (per curiam). We have made such an assumption and thus have jurisdiction to consider the second prong of *Saucier*'s test. It would be quite incongruous if a public official's right to an immediate appeal from a denial of qualified immunity were to evaporate simply because the district court failed or chose not to complete the required *Saucier* analysis.

## B.   Forfeiture

The individual defendants did not specifically raise in the district court the defense of qualified immunity with respect to the FHA claims. CHI thus urges that we find the issue forfeited and refuse to consider it. We do note, however, that the individual defendants including Chatterton and Birdsall did generally raise this issue in their amended memorandum in support of their motion for summary judgment. They argued that their motion fairly read was addressed to all claims against them, including the FHA claim.

Appellate courts will generally not entertain arguments that were not raised in the district court. However, we may exercise our discretion to consider an issue first raised on appeal if it "is a pure question of law and the record is sufficient to review the issue." *United States v. Alisal Water Corp.*, 431 F.3d 643, 654 n.4 (9th Cir. 2005). Qualified immunity is such an issue. *Bibeau v. Pac. Nw. Research Found., Inc.*, 188 F.3d 1105, 1111 n.5 (9th Cir. 1999), *as amended*, 208 F.3d 831 (9th Cir. 2000) ("Because qualified immunity presents a pure question of law which we review de novo, any decision by the district court would be entitled to no deference."). We have on occasion considered qualified immunity sua sponte. *Graves v. City of Coeur d'Alene*, 339 F.3d 828, 846 n.23 (9th Cir.

2003), *abrogated on other grounds by Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177 (2004).

CHI will not be prejudiced by our consideration of qualified immunity on the FHA claims because, as we have noted, we assume all disputed facts in CHI's favor, and the dispositive issue — which was fully addressed during oral argument — is one of law only. We turn now to the merits.

## C. The Fair Housing Act

**[12]** The FHA applies only to "dwellings." 42 U.S.C. § 3604. A dwelling is a structure "occupied as, or designed or intended for occupancy as, a residence," *id.* at § 3602(b), an "abode or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit," *Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Township*, 455 F.3d 154, 157 (3d Cir. 2006) (citation and internal quotation marks omitted). This court's previous application of the FHA to Community House — which did not involve the question of qualified immunity — was based on the state of the record at the time of the preliminary injunction appeal, when the building contained an emergency shelter *and* SROs, where residents would stay for up to a year and a half. *Cmty. House I*, 490 F.3d at 1048 n.2. We did not determine whether the River of Life facility under the *BRM's* management would also be a dwelling. In fact, after our decision in *Community House I*, the Idaho District Court determined in a separate case that the very facility at issue, as operated by the BRM, is *not* a dwelling. *Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries*, 655 F. Supp. 2d 1150, 1159 (D. Idaho 2009), *as amended*, 2010 WL 1913379 (D. Idaho 2010).

**[13]** However, we need not decide whether the FHA applies to the shelter as currently operated, because even if it does, that application was not clearly established in 2005. We had not determined whether homeless shelters in general met

the definition of a "dwelling," and we did not decide the issue in the previous appeal. *Cmty. House I*, 490 F.3d at 1048 n.2. Other courts had considered the issue, but there was no consensus on the FHA's applicability to such shelters. *Compare Woods v. Foster*, 884 F. Supp. 1169, 1173-74 (N.D. Ill. 1995) (shelter was a dwelling because the homeless have no other place to which to return), *with Johnson v. Dixon*, 786 F. Supp. 1, 4 (D.D.C. 1991) (shelter was likely not a dwelling but a "place of overnight repose and safety").

As far as Chatterton and Birdsall knew, the BRM was most likely to use the facility only as a short-term, emergency homeless shelter. The BRM's initial proposal to the City — which was declined in 2003 — proposed retaining the longer-term transitional apartments and SROs. However, by the time the BRM responded to the City's RFI/RFP process, its proposal did not state that Community House would be used in such a manner. The proposal focused instead on the BRM's "basic" emergency shelter programs. Chatterton requested that the BRM clarify how its men-only policy and religious services affected the "emergency shelter services" to be offered by the BRM. Ordinances 6402 and 6404, which declared Community House surplus property subject to sale, explicitly invoked Boise's need for an emergency shelter. Although the BRM was authorized under the lease to provide additional services, the BRM was *required* to provide only emergency shelter services and a soup kitchen. There is evidence that, as late as August 2005, the BRM was still considering including longer-term SROs in the building. But CHI has pointed to no evidence suggesting that the BRM discussed these considerations with Chatterton or Birdsall.

**[14]** Finally, even if it was clearly established that the FHA applied to Community House, a reasonable official could not have known that the single-men-only policy violated the statute. It was not until the earlier appeal that we determined what types of justifications could validate a facially discriminatory, men-only policy — an issue already subject to a circuit split.

*Cmty. House I*, 490 F.3d at 1050. The council members questioned the BRM regarding the policy, were assured that the women could stay at the City Light shelter and that it would be safer to house men and women in separate facilities, and even verified the BRM's claims of fewer police calls. These were reasonable actions, especially considering that this court later determined that a discriminatory policy based on legitimate, non-stereotypical safety concerns would in fact pass muster under the FHA. *Id.*

## D. The Establishment Clause

**[15]** The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. Applied to the states by the Fourteenth Amendment, the Establishment Clause does not prohibit all government involvement with religion. It allows the government to provide aid to a religious organization as long as the government action has a secular purpose and does not have the primary effect of advancing religion. *Cmty. House I*, 490 F.3d at 1055. CHI does not challenge this court's earlier conclusion that the lease and sale of Community House to the BRM had a secular purpose — to provide shelter for the homeless. *Id.* at 1055 n.9.

**[16]** Government aid to a religious organization will fail the "primary effect" test if it (1) results in government indoctrination; (2) defines the recipients of the aid by reference to religion; or (3) creates "excessive government entanglement" with religion. *Id.* at 1055. Because the lease and sale to the BRM did not define anybody by reference to religion and because under the lease the City retained no control over the BRM's management of the facility, our inquiry here focuses on indoctrination. Thus, to prove a violation of the Establishment Clause, CHI must show that (1) the BRM's activities at the River of Life Mission (formerly Community House) result in indoctrination, and (2) such indoctrination is "attributable to the government." *Id.* at 1056. We assume without deciding

that the BRM's chapel services and pre-meal prayers indoctrinate the shelter's guests. However, we conclude that it was not clearly established at the time of the lease that such indoctrination could be attributable to the government.

The district court determined that the BRM's indoctrination was attributable to the government for two reasons. First, during the lease period, "the City only charged the BRM rent of $1 per year for the building. . . , insured the premises[,] and paid for necessary repairs." *Cmty. House II*, 654 F. Supp. 2d at 1162. Second, the record contained conflicting evidence on whether the option price of $2 million was less than the market value of the property.[3] *Id.* We address each in turn.

### 1.   **Favorable Lease Terms**

As we recognized in *Community House I*, CHI's lease with the City was *more* favorable than the BRM's. 490 F.3d at 1057. The BRM was obligated to pay rent of $1 per year for the first five years, after which rent would escalate to a commercial rate, and the maximum term of the lease was only ten years. The CHI lease, on the other hand, required rent of only $1 per year for its fifty-year lease term. The City had similar repair and insurance responsibilities under both leases.

**[17]** CHI correctly points out that, although the BRM lease was (at worst) neutral when compared to the CHI lease, this fact is not, by itself, sufficient to defeat an Establishment Clause claim. *Cmty. House I*, 490 F.3d at 1057-58 (citing *Mitchell v. Helms*, 530 U.S. 793, 838-39 (2000) (O'Connor, J., concurring)). But neutrality is a very important factor in the indoctrination inquiry and tends to show that a private entity's indoctrination cannot be attributed to the government.

---

[3]Simply to adopt our previous analysis on this issue would be improvident. We now have the benefit of an expanded record on summary judgment, rather than the limited record we had in the preliminary injunction appeal.

*See Mitchell*, 530 U.S. at 810 (plurality) ("[I]f the government, seeking to further some legitimate secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose . . . then it is fair to say that any aid going to a religious recipient only has the effect of furthering that secular purpose."). Here, not only was the City neutral toward the BRM in its lease terms when compared to CHI's lease, the BRM actually got the *worse* deal. Where the BRM would have been required to pay market rent after five years, CHI was guaranteed that — throughout the entire fifty-year term of its lease — its rent would never exceed $1 per year.[4]

[18] If charging below-market rent to a non-profit religious organization on the same or worse terms than those received by a previous secular non-profit tenant would constitute government indoctrination, that was not clearly established in 2005. In *Christian Science Reading Room Jointly Maintained v. City and County of San Francisco*, 784 F.2d 1010, 1015 (9th Cir. 1986), *as amended*, 792 F.2d 124 (9th Cir. 1986), we held that leasing public property to a religious organization does not violate the Establishment Clause, as least where the lease was on the same terms as leases offered to *commercial* tenants. That case did not address whether it would violate the Establishment Clause if such a lease were offered on the same terms as those received by other *non-profit* tenants. When pressed during oral argument for their best case on this issue, plaintiffs' counsel cited this case. It does not help them.

At least one court has decided such a case. In *Fairfax Covenant Church v. Fairfax County Sch. Bd.*, 17 F.3d 703 (4th

---

[4]CHI argues that the correct annual rent comparison between the two leases is the $1 per year the BRM paid versus the $125,000 in rent CHI reported to the City from the occupants of Community House. CHI ignores the fact that when the City was receiving this rent, it was also expending over $200,000 annually to fund operations at Community House. Once the BRM took over, the City was able to save that money and use it for other projects.

Cir.), *cert. denied*, 511 U.S. 1143 (1994), the Fourth Circuit considered a school board policy of leasing public facilities for an amount of rent determined by the type of entity. Student organizations and groups primarily benefitting the public did not have to pay rent. *Id.* at 704. Cultural, civic, and educational groups paid rent at a "noncommercial" rate. *Id.* For five years churches paid the noncommercial rate, which then escalated to the commercial rate. *Id.* at 705. The court held that charging churches the same below-market rent as the other *non-profit* groups would not violate the Establishment Clause, but that charging them *commercial* rent — which it termed "rent discrimination" — violated the Free Exercise and Free Speech Clauses. *Id.* at 706-07.

**[19]** Faced with a dearth of binding case law on the subject of non-profit leases to religious organizations — and a Fourth Circuit case holding that "rent discrimination" based on religion was unconstitutional — a reasonable official would not have known that the BRM lease violated the Establishment Clause. When the City undertook its RFI/RFP process, the BRM was the only entity that proposed to purchase Community House. Given that no other non-profit organizations were willing or able to keep the doors of the shelter open, the decision to lease the building to the BRM was reasonable.

## 2.  The $2 Million Sale Price

**[20]** With respect to the option to purchase, case law before 2005 suggested that, generally, a sale of public property to a religious organization for less than market value would likely violate the Establishment Clause. *See*, *e.g.*, *Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 492 (7th Cir. 2000) (sale constitutional even though city did not solicit alternate bids: sale complied with state law, purchaser paid market value, and the city had no further maintenance responsibilities); *Southside Fair Hous. Comm. v. City of New York*, 928 F.2d 1336, 1348-49 (2d Cir. 1991) (sale constitutional where party paid market value, land was trans-

ferred for private use, and property did not appear connected to the city in any way). But no case in the Ninth Circuit or elsewhere had held that a below-market sale would be unconstitutional where the organization also executed an important city policy *and* saved the city money — the situation with which we are confronted here. The City did not give the BRM a gift; in fact, it received substantial consideration from the BRM. In return for management and ownership of the property, the City was relieved of the obligation and costs of operating the shelter, while at the same time ensuring as a matter of City policy that the shelter stayed open.

**[21]** Moreover, although there might be an issue of fact as to the market value of the property, it would not have been clear to a reasonable official that setting the option price at $2 million would violate the Constitution. The appraisal prepared at the request of the City of Community House was accompanied by an explicit warning that the $3.22 million use value was *not* market value. Knipe told the City that the figure might be used as an opening offer during purchase negotiations, but the City was required by law to put the property up for auction. It could hardly have set the minimum auction price at the highest possible value and expect to receive any bids. The City knew only that the most probable sale price of the building was somewhere between $850,000 and $3.22 million. The property failed to receive a satisfactory bid at $2.5 million.[5] The BRM initially wanted to pay only $1.8 million. Negotiating a $2 million option price, which under the lease would increase as time went on, seems a reasonable solution to the somewhat elusive concept of market value.

---

[5]Although CHI offered to purchase the property for $2.5 million of its "equitable interest," CHI had no equitable interest to bid. It had agreed in 2004 to terminate the lease and the Operating Agreement and to transfer all of its assets to the City. Thus, Chatterton was correct in informing the mayor and council members that CHI could not possibly purchase the property.

Having received no viable bids at the auction, the City was not required to begin the entire the process all over again. Because the facility did not sell at the auction, the City Council was specifically empowered by Idaho law to dispose of the property however it believed was "in the best interest of the [C]ity." Idaho Code § 50-1403(1). And it did so.

[22] Even if the auction had generated a viable bid, the City would not have been required to accept it. No principle of Establishment Clause jurisprudence requires that the government choose a secular entity over a religious one simply because it is secular. Having had problems with CHI's management in the past, the City was not obligated to continue to work with CHI when another opportunity presented itself. CHI was consistently late in providing the required financial audits and rental income reports to the City. CHI faced an allegation of embezzlement, and the President of CHI admitted that CHI had not been able properly to track all of its money. The City had given CHI a chance at helping the City ensure that the Boise homeless would have a place to sleep — a chance that lasted nearly ten years. Its decision to give a similar chance to the BRM did not violate the First Amendment.

# V

## CONCLUSION

CHI must be satisfied with the City and the Council as defendants on the substantive issues raised in this case and with Chatterton and Birdsall in their official capacities only. Our decision today has no effect on CHI's claims against them. As the Supreme Court held in *Owen v. City of Independence*, "imposing personal liability on public officials could have an undue chilling effect on the exercise of their decision-making responsibilities, but . . . no such pernicious consequences [are] likely to flow from the possibility of a recovery from public funds." 445 U.S. 622, 653 n.37 (1980) (munici-

palities have no immunity from damages flowing from their constitutional violations). We hold only that as a matter of law, the individual defendants are beyond the reach of CHI's claims. To pursue these individuals — as suggested at oral argument by CHI's counsel — for damages, punitive or otherwise, serves no legally cognizable purpose.

Mayor Bieter and City Council members Jordan, Clegg, Bisterfeldt, Eberle, Mapp, and Shealy are absolutely immune from suit, either for damages or injunctive relief. The lease and sale of Community House to the BRM, preceded as it was by the City's long partnership with CHI and grants of large amounts of funding, "reflected a discretionary, policymaking decision implicating the budgetary priorities of the [C]ity and the services the [C]ity provides to its constituents." *Bogan*, 523 U.S. at 55-56.

City employees Chatterton and Birdsall are entitled to qualified immunity with respect to CHI's Establishment Clause and FHA claims against them in their individual capacities. At the time of the lease to the BRM, a reasonable official would not have known that those actions would result in government indoctrination or in violations of the FHA.

**REVERSED and REMANDED.**

---

Chief Judge KOZINSKI, concurring:

The relevant facts, put in the light most favorable to the plaintiffs, are much simpler than you'd think after reading the majority's opinion: Boise wanted to address the problem of homelessness, so it helped establish Community House. It eventually took over, closed the shelter and evicted everyone, including tenants living in longer-term housing. It then leased the building for a dollar a year to a Christian organization called Boise Rescue Mission, with an option to purchase at a

below-market price. The building, which the Rescue Mission eventually bought, had to include a shelter for at least 66 homeless men but could also be used for other residential purposes. The Boise City Council and mayor approved the deal. Two other city officials helped implement the plan. The Rescue Mission resumed at least one long-term housing program and permitted only men to stay overnight. It also indoctrinated guests with religious activities.

On those facts, I agree that the individual councilmen and mayor are entitled to legislative immunity. But I disagree with the way the majority comes to that conclusion. It holds that we have to look at whether the particular lease and sale fit into a broader plan to address homelessness. *See* maj. at 16791 (examining the "larger developing universe" to determine whether particular "disputed acts" were "essentially legislative or not"). That approach is foreclosed by *Kaahumanu* v. *County of Maui*, 315 F.3d 1215 (9th Cir. 2003). In that case, we decided that county councilmen could be sued for their vote to deny a conditional use permit—an ad hoc decision (a "disputed act[ ]") we distinguished from the county's broader zoning policy (the "larger developing universe"). *Id.* at 1218-20, 1224. The distinction is important because almost any discrete, narrow decision—like denying a permit—could otherwise be recast as part of some bigger legislative plan and shielded by legislative immunity. Legislative immunity turns on whether a particular disputed act, rather than some nebulous "universe" of related policies, is essentially legislative. We're bound by our precedent.

Legislative immunity does apply to some very narrow actions, including core budgeting decisions that affect the public at large. *See, e.g.*, *San Pedro Hotel Co.* v. *City of Los Angeles*, 159 F.3d 470, 473, 476 (9th Cir. 1998) (single loan of public money); *see also Bogan* v. *Scott-Harris*, 523 U.S. 44, 47, 55-56 (1998) (city budgeting). Legislators should not have to answer for every decision to appropriate public resources to one project instead of another. *See San Pedro*

*Hotel*, 159 F.3d at 476 ("This is precisely the type of decision for which a legislator must be given immunity. To hold otherwise would expose virtually every municipal funding decision to judicial review."). Yet that's essentially what the plaintiffs allege the mayor and city council did here: wrongly approve legislation subsidizing the lease and sale of a public building to the Rescue Mission rather than sell it to Community House. The majority therefore reaches the right result on legislative immunity, but not for the right reasons.

I also disagree with the majority's qualified immunity analysis, even assuming that the plaintiffs sued Birdsall and Chatterton—the remaining individual defendants—in their individual capacities. *See Eng* v. *Cooley*, 552 F.3d 1062, 1064 n.1 (9th Cir. 2009). Addressing the Establishment Clause claims, the majority acknowledges that it's probably unconstitutional to sell a public building at a below-market price offered only to an organization using it for religious indoctrination. Maj. at 16808-09, 16810-11. But the majority also suggests that such a sale might *not* be unconstitutional if it would save the city some money and require the religious group to "execute[ ] an important city policy." *Id.* at 16811. The majority can't cite a single case or reason that justifies carving out that exception. And no wonder: Almost every municipal service costs money, but that doesn't mean a city can give away its sanitation department to the Muslims, its police department to the Jews or its schools to the Catholics in an exclusive sweetheart deal.

Birdsall and Chatterton are entitled to qualified immunity from the Establishment Clause claims for a very basic reason independent of whether approving the deal here was clearly unconstitutional at the time: *They* didn't make the decision to lease and sell Community House to an organization that discriminated on the basis of religion. The complaint accused them only of "implementing the policies of the City of Boise," and we shouldn't consider additional allegations that were "newly minted" on appeal. *See Dream Games of Ariz.,*

*Inc.* v. *PC Onsite*, 561 F.3d 983, 995-96 (9th Cir. 2009); *Crawford* v. *Lungren*, 96 F.3d 380, 389 n.6 (9th Cir. 1996). Even if we do, Chatterton simply ran the RFP and auction processes, attended meetings and helped prepare the lease for Council approval. Birdsall apparently played no role in negotiating the lease and sale. *Their* conduct isn't what triggered the alleged Establishment Clause problem. *See Whitaker* v. *Garcetti*, 486 F.3d 572, 582 (9th Cir. 2007) ("[A]n individual defendant is stripped of qualified immunity only if he personally violated a plaintiff's constitutional rights.").

Birdsall and Chatterton have qualified immunity from the Fair Housing Act claims for similar reasons. They didn't approve the men-only policy authorized by city council and implemented by the Rescue Mission. *See Dittman* v. *California*, 191 F.3d 1020, 1027 (9th Cir. 1999) ("[W]hen a public official acts in reliance on a duly enacted statute or ordinance, that official ordinarily is entitled to qualified immunity."); *Grossman* v. *City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994). And they could have reasonably believed that the policy was justified by legitimate safety concerns. *See Cmty. House, Inc.* v. *City of Boise*, 490 F.3d 1041, 1050-51 (9th Cir. 2007). We need not cast doubt, as the majority does, on a published opinion by a previous panel that had "little trouble" concluding that the Act did apply to at least parts of the building as operated by the Rescue Mission before the sale. *See Cmty. House*, 490 F.3d at 1047-48 & n.2; *see* maj. at 16805-06.

Like the majority, I would hold that the individual defendants are entitled to immunity. But I see no reason to depart from our precedent in doing so.