**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MITCHELL BARNES-WALLACE;
MAXWELL BREEN; LORI BARNES-
WALLACE; LYNN BARNES-
WALLACE; MICHAEL BREEN;
VALERIE BREEN,
    *Plaintiffs-Appellees*,

    v.

CITY OF SAN DIEGO,
    *Defendant*,

    and

BOY SCOUTS OF AMERICA - DESERT
PACIFIC COUNCIL,
    *Defendant-Appellant*.

No. 04-55732

D.C. No.
CV-00-01726-
NAJ/AJB

MITCHELL BARNES-WALLACE;
MAXWELL BREEN; LORI BARNES-
WALLACE, Guardian Ad Litem;
LYNN BARNES-WALLACE, Guardian
Ad Litem; MICHAEL BREEN,
Guardian Ad Litem; VALERIE
BREEN, Guardian Ad Litem,
                *Plaintiffs-Appellants*,

v.

CITY OF SAN DIEGO; BOY SCOUTS OF
AMERICA - DESERT PACIFIC
COUNCIL,
                *Defendants-Appellees*.

No. 04-56167

D.C. No.
3:00-cv-01726-J-
AJB

OPINION

Appeal from the United States District Court
for the Southern District of California
Napoleon A. Jones, Jr., District Judge, Presiding

Argued and Submitted
June 20, 2011—Pasadena, California

Filed December 20, 2012

Before: William C. Canby, Jr., Andrew J. Kleinfeld,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Canby;
Concurrence by Judge Kleinfeld

# SUMMARY[*]

## Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment and dismissal of a complaint which alleged that two leases of land for one dollar per year by the City of San Diego to the Desert Pacific Council, a nonprofit corporation chartered by the Boy Scouts of America, violated, among other things, provisions of the California or federal Constitutions relating to the Establishment of Religion or the denial of Equal Protection of the Laws.

Plaintiffs alleged that they would use the land or facilities leased by the Desert Pacific Council but for the Boy Scouts' discriminatory policies, which prohibit atheists, agnostics, and homosexuals from being members or volunteers and require members to affirm a belief in God.

The panel held that the district court erred in ruling that the City's leases with the Boy Scouts violated the No Aid Clause of the California Constitution. The panel determined that the leases constitute, at most, indirect or incidental aid by the City for a religious purpose, and the aid does not otherwise violate the requirements established by the Supreme Court of California to avoid invalidity under the No Aid Clause.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel also concluded that the leases do not violate either the California No Preference Clause or the federal Establishment Clause. The panel reversed the district court's grant of summary judgment to the plaintiffs, and remanded with instructions to grant summary judgment to the Council on these claims.

The panel affirmed the district court's dismissal of plaintiffs' state and federal equal protection claims on the ground that the plaintiffs lacked standing to maintain those claims.

The panel also affirmed the district court's dismissal of plaintiffs' claims for violation of the San Diego Human Rights ordinance and for breach of contract.

Concurring, Judge Kleinfeld joined the majority but wrote separately to note that this court erred in its previous opinion addressing standing. *See Barnes-Wallace v. City of San Diego,* 530 F.3d 776, 794 (9th Cir. 2008) (Kleinfeld, J., dissenting).

---

**COUNSEL**

Mark W. Danis, Morrison & Foerster, LLP, San Francisco, California; M. Andrew Woodmansee, Morrison & Foerster, LLP, San Diego, California, for Plaintiffs-Appellants–Cross-Appellees.

Scott H. Christensen, Hughes Hubbard & Reed, LLP, Washington, D.C.; George A. Davidson and Carla A. Kerr, Hughes Hubbard & Reed, LLP, New York, New York, for Defendants-Appellees–Cross-Appellants.

Sheldon T. Bradshaw, David K. Flynn, Eric W. Treene and Angela Miller, United States Department of Justice, Civil Rights Division, Washington, D.C., for Amicus Curiae United States.

Paul Rosenzweig, Washington, D.C., for Amicus Curiae American Legion.

Matthew F. Stowe, Office of the Attorney General, Austin, Texas, for Amici Curiae States of Texas, Alabama, Kansas, Oklahoma, South Dakota and Virginia.

Anthony R. Picarello, Jr., Derek L. Gaubatz and Roger T. Severino, Washington, D.C., for Amicus Curiae The Becket Fund for Religious Liberty.

John C. Eastman, Orange, California, for Amicus Curiae Claremont Institute Center for Constitutional Jurisprudence.

Peter Ferrara, McLean, Virginia, for Amicus Curiae American Civil Rights Union.

Eric Alan Isaacson, Michelle M. Ciccarelli and Alreen Haeggquist, San Diego, California; Rev. Silvio Nardoni, Glendale, California; Susan Kay Weaver, El Cajon, California, for Amici Curiae Social Justice Committee and Board of Trustees of the First Unitarian Universalist Church of San Diego; its Ministers, the Rev. Arvid Straube and the Rev. Julie Kain; its Director of Religious Education, Elizabeth Motander Jones; the Unitarian Universalist Legislative Ministry California; the Unitarian Universalist Association of Congregations.

Angela Sierra, Office of the Attorney General for the State of California, for Amicus Curiae State of California.

Ayesha N. Khan and Alex J. Luchenitser, Washington, D.C., for Amicus Curiae Americans United for Separation of Church and State.

John H. Findley and Harold E. Johnson, Pacific Legal Foundation, Sacramento, California, for Amici Curiae Pacific Legal Foundation and Veterans of Foreign Wars.

Robert J. Muise and Julie Schotzbarger, Ann Arbor, Michigan, for Amicus Curiae Thomas More Law Center.

Paul A. Hoffman, Santa Ana, California, for Amicus Curiae Individual Rights Foundation.

**OPINION**

CANBY, Circuit Judge:

This appeal presents the primary question whether two leases of land by the City of San Diego to the Desert Pacific Council, a nonprofit corporation chartered by the Boy Scouts of America, violate provisions of the California or federal Constitutions relating to the Establishment of Religion or the denial of Equal Protection of the Laws. Additional issues concern claims that the Council's actions as lessee violate the San Diego Human Dignity Ordinance and that the Council breached a nondiscrimination provision of the leases.

The Council pays one dollar per year rent for the Camp Balboa property in Balboa Park and no rent for the Youth Aquatic Center property on Fiesta Island in Mission Bay Park. In return, the Council operates Camp Balboa and the Youth Aquatic Center. Camp Balboa and the Youth Aquatic Center are public facilities, but the Council maintains a non-public, local administrative headquarters at Camp Balboa. The Council's members extensively use both the Camp and the Center. The Boy Scouts, and accordingly the Council, prohibit atheists, agnostics, and homosexuals from being members or volunteers and require members to affirm a belief in God.

The adult plaintiffs are users of Balboa Park and Mission Bay Park who are either lesbians or agnostics. They and their plaintiff sons would use the land or facilities leased by the Desert Pacific Council but for the Boy Scouts' discriminatory policies.

We conclude that the Camp Balboa and Youth Aquatic Center leases do not violate the No Aid Clause of the California Constitution because the leases constitute, at most, indirect or incidental aid by the City for a religious purpose, and the aid does not otherwise violate the requirements established by the Supreme Court of California to avoid invalidity under the No Aid Clause.

We also conclude that the leases do not violate either the California No Preference Clause or the state and federal Establishment Clauses. We accordingly reverse the district court's grant of summary judgment to the plaintiffs, and remand with instructions to grant summary judgment to the Council on the state and federal constitutional claims.

We also affirm the district court's dismissal of the plaintiffs' claims under the state and federal Equal Protection Clauses.

Finally, we affirm the district court's dismissal of the plaintiffs' claims of violation of the San Diego Human Rights Ordinance and breach of contract.

## I.   Statement of Facts

In reviewing the summary judgment against the Council and the Boy Scouts, we view any disputed facts in the light most favorable to the Scout defendants, the non-moving parties. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). Our review of the record reveals, however, that the underlying facts material to our decision are undisputed; the parties differ in material ways only in regard to the legal effect of those facts.

### A.  The Parties

The Desert Pacific Council is a nonprofit corporation chartered by the Boy Scouts to administer Scouting programs in the San Diego area.  Both the Council and the Boy Scouts of America are named as defendants.  Congress chartered the Boy Scouts of America "to promote . . . the ability of boys to do things for themselves and others, to train them in scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods that were in common use by boy scouts on June 15, 1916."  36 U.S.C. § 30902 (2012).   While Scouting focuses primarily on outdoor activity, the Boy Scouts' rules include a prohibition against allowing youths or adults who are atheists, agnostics, or homosexuals to be members or volunteers.  *Cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659-61 (2000) (holding that the Boy Scouts have a constitutional right to exclude homosexuals).   These rules bind the Council.   The Boy Scouts[1] maintain that agnosticism, atheism, and homosexuality are inconsistent with their goals and with the obligations of their members.  *See Randall v. Orange Cnty. Council, Boy Scouts of Am.*, 952 P.2d 261, 264–65 (Cal. 1998) (reciting that, in defending its right to exclude atheists, the Boy Scouts introduced "evidence intended to establish that requiring the inclusion of nonbelievers . . . would interfere with the organization's efforts to convey its religious message").

The Boy Scouts do not require Scouts to affiliate with any outside religious group, and the Boy Scouts style themselves as "absolutely nonsectarian."  According to both parties, the

---

[1] We use the term "Boy Scouts" to cover the Council and the Boy Scouts of America collectively.

Council itself is "not a house of worship like a church or synagogue, [but] it is a religious organization." All members and volunteers take an oath to "do my best [t]o do my duty to God and my country" and to remain "morally straight." Duty to God is placed first in the Oath as "the most important of all Scouting values." Members also must agree to uphold the "Scout Law," which provides that a Scout is "faithful in his religious duties." Membership and leadership applications contain a "Declaration of Religious Principle," which explains that "no member can grow into the best kind of citizen without recognizing an obligation to God." Boy Scout leaders are instructed that they "can be positive in their religious influence and can encourage Scouts to earn the religious emblem of their faith."

The plaintiffs Barnes-Wallaces are a lesbian couple, and the plaintiffs Breens are agnostics. Because of their sexual orientation and religious beliefs, they cannot be Boy Scout volunteers. Both couples had plaintiff sons old enough to join the Boy Scouts, and they would have liked their sons to use the leased facilities, but the couples, as parents, refused to give the approval required for membership. The Barnes-Wallaces and the Breens object to the Boy Scouts' policies as discriminatory, and they refuse to condone such practices by allowing their sons to join the Boy Scouts. They also refuse to use the leased facilities as members of the public, so long as the Boy Scouts administer the properties.

## B. The Leases

In accord with its long history of "permitting City property to be used by nonprofit organizations for the cultural, educational, and recreational enrichment of the citizens of the City," the plaintiffs' home town of San Diego

has leased 123 public properties to various nonprofit organizations.[2]   One of these organizations is the Desert Pacific Council, which leases, occupies, and operates portions of Balboa Park and Mission Bay Park, two popular city parks. Other portions of those parks are extensively used by the plaintiff families.

One of the Council's leases with the City is for approximately eighteen acres in Balboa Park known as Camp Balboa.  Camp Balboa offers a "unique" urban camping opportunity in the "heart of the City."  The site includes campgrounds, a swimming pool, an amphitheater, a program lodge, a picnic area, a ham radio room, restrooms and showers, and a camp ranger office.  Under the original lease, the Council paid one dollar per year in rent.  In 2002, the City and the Council entered into a new twenty-five-year lease, which requires the Council to pay one dollar in annual rent and a $2,500 annual administration fee.  The lease also requires the Council to maintain the property and to expend at least $1.7 million for capital improvements over seven years.  The Council has landscaped, constructed recreational facilities, and installed water and power on the property.

The Council also leases land from the City on Fiesta Island in Mission Bay Park.  In 1987, the City entered into a

---

[2] These organizations include indisputably religious and arguably religious organizations (e.g., San Diego Calvary Korean Church, Point Loma Community Presbyterian Church, Jewish Community Center, Salvation Army), organizations concerned with children or the elderly (e.g., Camp Fire, Girl Scouts, ElderHelp, Little League), organizations that limit their membership or services on the basis of race or ethnicity (e.g., Vietnamese Federation of San Diego, Black Police Officers Association), and art museums and similar institutions (e.g., San Diego Art Institute, Old Globe Theater).

twenty-five-year, rent-free lease with the Desert Pacific Council for one-half acre of waterfront property on Fiesta Island. The City entered into this lease after the Desert Pacific Council approached it about building and operating an aquatic center on the island.  The Council was awarded the lease on the condition that it expend $1.5 million to build the Youth Aquatic Center.  It actually spent about $2.5 million to build the Center, and now operates it.  The facility offers the use of kayaks, canoes, sail and row boats, and classroom space to other youth groups at inexpensive rates.

The City negotiated these leases with the Council on an exclusive basis, as it sometimes does with groups, religious or secular, that it deems appropriate operators of a particular piece of City property.  Other organizations receive similar terms.  Some ninety-six of the City's leases to nonprofits (including nineteen leases to youth-oriented recreational nonprofits) require no rent or rent less than the $2,500 fee the Council pays, and at least fifty of them have terms of twenty-five years or longer.  Although they produce little to no revenue, these leases save the City money by placing the costs of maintenance and improvement upon the lessee organizations.  The City spends nothing on the properties leased to the Council.

### C.  Occupancy of the Land

The Desert Pacific Council makes exclusive use of portions of the Camp Balboa property for its own benefit. The Council has its headquarters on park property.  From this facility it oversees its $3.7 million budget, manages its thirty employees, and processes applications for membership and leadership positions.  The Council also has a print shop on

park land that it uses to print literature for its members. These portions of the park are unavailable for public use.

Other portions of Camp Balboa and the Youth Aquatic Center are regularly used for Boy Scout activities. Those portions also are available for use by non-member groups and individuals, but the Council manages reservations of these recreational facilities. Although Boy Scout entities have priority in reserving space at the facilities, the Council has not turned away any non-Scout group or individuals while Scouting is in session, either at Camp Balboa or at the Aquatic Center. Both properties charge fees for use, but there is no evidence that the fees equal or exceed the cost of maintaining the facilities.

The Boy Scouts primarily engage in camping and water sports activities on the leased properties. However, some Boy Scout members engage in voluntary religious activities, such as religious services, on the leased properties. There are now no religious symbols at either Camp Balboa or the Youth Aquatic Center. At Camp Balboa, there was formerly an outdoor meeting area that had signs saying "Scout Chapel" and "[a] Scout is Reverent."

## D.  The Plaintiffs' Injury

The plaintiffs never applied to use Camp Balboa or the Youth Aquatic Center; there is no evidence that the Council actively excluded them. Rather, they testified that the Council's occupation and control of the land deterred them from using the land at all. The plaintiffs desired to make use of the recreational facilities at Camp Balboa and the Youth Aquatic Center, but not under the Council's authority. As a result, they actively avoided the land. They refused to

condone the Boy Scouts' exclusionary policies by seeking permission from the Council to use the leased facilities, by using the leased facilities subject to the Council's possession and control, or by paying fees to the Council for use of the facilities. They had an aversion to the facilities and felt unwelcome there because of the Boy Scouts' policies that discriminated against people like them.

## II.  Procedural History

This case has a long procedural history. The plaintiff families brought this action against the City of San Diego, the Boy Scouts, and the Desert Pacific Council, alleging that leasing public land to an organization that excludes persons because of their religious and sexual orientations violates the state and federal Establishment Clauses, the California Constitution's No Preference and No Aid Clauses, the state and federal Equal Protection Clauses, the San Diego Human Dignity Ordinance, and state contract law. The district court found that the plaintiffs had standing as municipal taxpayers for their constitutional claims. Both sides sought summary judgment.

The district court held that the leases violated the federal Establishment Clause and the California No Aid and No Preference Clauses; it granted summary judgment for the plaintiffs. *Barnes-Wallace v. Boy Scouts of Am.*, 275 F. Supp. 2d 1259, 1276-80 (S.D. Cal. 2003). In the amended final judgment, the court enjoined the Balboa Park and Youth Aquatic Center leases. The City then notified the Council that under the terms of the 2002 Camp Balboa lease, the term tenancy was terminated and converted to a month-to-month tenancy. The plaintiffs have since settled with the City. The

Scout defendants appealed the district court's grant of summary judgment.

In a prior decision, we determined that the Scout defendants' appeal was not moot and that the plaintiffs had standing based on their personal harm and loss of recreational enjoyment, but we rejected the district court's finding that they had standing as municipal taxpayers. *Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 783–87 (9th Cir. 2008). We also certified three questions to the California Supreme Court regarding whether the leases violated the California Constitution's No Aid and No Preference Clauses. *Id.* at 779. The California Supreme Court initially denied our certification request without prejudice to renewal after our ruling on standing became final.

We denied the Scout defendants' petition for rehearing en banc of our decision on standing. *See Barnes-Wallace v. City of San Diego*, 551 F.3d 891 (9th Cir. 2008). The Scout defendants then filed a petition for certiorari, and we stayed further proceedings pending the decision of the United States Supreme Court on the petition. The United States Supreme Court ultimately denied certiorari. *See Boy Scouts of Am. v. Barnes-Wallace*, 130 S. Ct. 2401 (2010).

Our standing ruling having become final, we renewed our certification request to the California Supreme Court, which was declined. *See Barnes-Wallace v. City of San Diego*, 607 F.3d 1167 (9th Cir. 2010). Accordingly, the matter is back before us to review the district court's grant of summary judgment in favor of the plaintiffs.

### III.    Jurisdictional Analysis

As a preliminary matter, we must determine whether we have jurisdiction over this appeal.    We have statutory jurisdiction under 28 U.S.C. § 1291, but questions have been raised whether the matter remains an actual case or controversy, which is required for our constitutional jurisdiction under Article III.    *See Harrison W. Corp. v. United States*, 792 F.2d 1391, 1392 (9th Cir. 1986). Therefore, we address issues of mootness and standing before proceeding further.

### A.  Mootness

The Scout defendants contend that the appeal is moot because the two son plaintiffs, Mitchell Barnes-Wallace and Maxwell Breen, have turned eighteen years old.  The appeal is not moot because the plaintiffs still have a "legally cognizable interest for which the courts can grant a remedy." *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854 (9th Cir. 1999).  We previously held that the plaintiffs have standing to pursue this action because they have "shown both personal emotional harm and the loss of recreational enjoyment, resulting from the Boy Scouts' use and control of Camp Balboa and the Aquatic Center."  *Barnes-Wallace*, 530 F.3d at 785.  The plaintiffs continue to experience that same injury.

In addition to the two son plaintiffs, the parents, Lori and Lynn Barnes-Wallace and Michael and Valerie Breen, are plaintiffs in their own right, and their injury is not premised on injury to their children.  The parent plaintiffs are barred from being volunteers in the Boy Scouts because they are

homosexuals or agnostics respectively.[3]    The Barnes-Wallaces and Breens submitted declarations asserting, without contradiction by the Scout defendants, that they would like to use Camp Balboa as a family, but they avoid doing so because they are offended by the Boy Scouts' exclusion, and publicly expressed disapproval, of lesbians, atheists and agnostics. The record does not indicate that there is an age restriction for use of Camp Balboa and, therefore, the parent plaintiffs could continue to use Camp Balboa, with or without their children, after Mitchell Barnes-Wallace and Maxwell Breen turn eighteen years old.[4]

Moreover, individuals who are eighteen years old can be members of the Boy Scouts, and can use the Youth Aquatic Center and Camp Balboa. The Boy Scouts include a "Venturing" program, which is open to young men and women who are fourteen through twenty years of age. Scout summer camps at the Youth Aquatic Center are available to members of the Venturing program. The Youth Aquatic Center lease allows youths up to eighteen years old to camp and participate in aquatic activities. Quarterly reports indicate that adults frequently use the Aquatic Center.

We conclude that the plaintiffs continue to have a legally cognizable interest, and that "a favorable decision is likely to

---

[3] The plaintiffs explicitly do not challenge the Boy Scouts' right to hold discriminatory views or arbitrarily limit their membership based on their views; they object to the Boy Scouts' management of the Park and Center under the City Leases.

[4] A former president of the Desert Pacific Council testified that the campsites are available to "families" and "anybody who asks to reserve them, first-come/first-serve."

redress their injuries." *Barnes-Wallace*, 530 F.3d at 784. Therefore, the appeal is not moot.[5]

## B. Standing

The Scout defendants contend that we should reconsider our prior decision that the plaintiffs have standing for their constitutional claims based on the state and federal religion clauses. *See id.* at 784–86. Under the law of the case doctrine, we follow our prior decision "unless (1) the decision is clearly erroneous and its enforcement would work a manifest injustice; (2) intervening controlling authority makes reconsideration appropriate; or (3) substantially different evidence was adduced at a subsequent trial." *Alaimalo v. United States*, 645 F.3d 1042, 1049 (9th Cir. 2011). Our prior decision on standing was published, however, and became the law of the circuit. The exceptions to the law of the case doctrine are not exceptions to the rule that, as a three-judge panel, we are bound by the law of the circuit in the absence of a recognized exception to that rule. *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc).

The Scout defendants primarily contend that reconsideration is appropriate because of the Supreme

---

[5] The Scout defendants also suggest that the appeal is moot because the two son plaintiffs, Mitchell Barnes-Wallace and Maxwell Breen, are attending college outside of San Diego. Mitchell Barnes-Wallace is attending school in Los Angeles, California, and Maxwell Breen is attending school in San Francisco, California. This fact, however, does not preclude their interest in using Camp Balboa and the Youth Aquatic Center during school breaks. Moreover, as discussed above, their parents are also plaintiffs and have an injury independent of Mitchell Barnes-Wallace and Maxwell Breen.

Court's intervening decision in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009). If *Summers* undermined our published decision on standing in this case, it would present a recognized exception to the law of the circuit rule. *Gonzalez*, 677 F.3d at 389 n.4. We conclude, however, that *Summers* does not undermine our prior ruling. In *Summers*, conservation organizations filed suit to enjoin the U.S. Forest Service from applying regulations that eliminated certain notice and appeal rights with respect to projects in U.S. National Forests nationwide. 555 U.S. at 490. The Court held that the plaintiffs' affidavit in support of standing was insufficient, in part because it did not assert any "firm intention" to visit project locations, stating only that one of the plaintiffs "'want[s] to' go there." *Id.* at 496 (alterations in original).[6] The Court reasoned that "[t]his vague desire to return is insufficient to satisfy the requirement of imminent injury: 'Such 'some day' intentions – without any description of concrete plans, or indeed any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require.'" *Id.* at 496 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)). Therefore, the Court concluded that the plaintiffs lacked standing because they failed to identify any application of the regulations that "threatens imminent and concrete harm." *Id.* at 495.

---

[6] That affidavit in support of standing in *Summers* also included a statement of the affiant's intention to visit the National Forests in general. 555 U.S. at 495. The Supreme Court held that allegation insufficient, stating: "Accepting an intention to visit the National Forests as adequate to confer standing to challenge any Government action affecting any portion of those forests would be tantamount to eliminating the requirement of concrete, particularized injury in fact." *Id.* at 496. The allegations of the Barnes-Wallaces and Breens in the present case suffer from no such lack of specificity.

The Scout defendants argue that, like *Summers*, the plaintiffs here do not allege any concrete plans to visit Camp Balboa or the Youth Aquatic Center. However, we already rejected this argument in our earlier decision, relying on *Lujan*, the same authority cited in *Summers*. We determined that "[t]his is not a case where the plaintiffs have no plan to use the land in question." *Barnes-Wallace*, 530 F.3d at 785 (citing *Lujan*, 504 U.S. at 564 (requiring "concrete plans" to visit a place of environmental harm for a finding of actual and imminent injury)). *Summers* accordingly does not support reconsideration of our prior decision regarding standing.[7]

The Scout defendants also rely on this court's intervening decision in *Caldwell v. Caldwell*, 545 F.3d 1126 (9th Cir. 2008). *Caldwell* held that the plaintiff lacked standing to raise an Establishment Clause claim arising out of her feeling offended by the discussion of religious views on the "Understanding Evolution" website created and maintained by the University of California. *Id.* at 1132. Standing was denied because the plaintiff's objection was too "abstract" and "tenuous." *Id.* at 1132. *Caldwell* is distinguishable, however, because, as we noted in our prior decision, the plaintiffs here "are not bystanders expressing ideological disapproval of the government's conduct," but rather have a "personal interest in the land at issue." *Barnes-Wallace*, 530 F.3d at 785–86. Moreover, *Caldwell* was before us when we denied rehearing en banc of our standing decision; the dissent from denial of rehearing en banc cited *Caldwell*. *Barnes-Wallace*, 551 F.3d at 898 (O'Scannlain, J., dissenting). We therefore need not revisit *Caldwell*. Finally,

---

[7] After *Summers* was decided, the Supreme Court denied the Boy Scout defendants' petition for certiorari to review our standing decision. *Boy Scouts v. Barnes-Wallace*, 130 S. Ct. 2401 (2010).

we note that *Caldwell*, as a decision by a later three-judge panel, cannot by its own force overrule this panel's prior opinion. *See Newdow v. Lefevre*, 598 F.3d 638, 644 (9th Cir. 2010).

For all of these reasons, we decline the Scout defendants' invitation to reconsider our prior decision regarding standing.**[8]**

## IV.    The California No Aid Clause

The plaintiffs contend that the City's leases to the Council violate both the California and federal Constitutions.[9]  We first determine whether the City's leases violate the California Constitution.[10]  *See Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004) ("[F]ederal courts should not decide federal constitutional issues when alternative grounds yielding the same relief are available.").

---

[8] We recognize that the standing of the Barnes-Wallace plaintiffs, as lesbians, to challenge the leases as violations of the California No Aid and No Preference Clauses and of the state and federal Establishment Clauses is tenuous.  The Breens, as atheists, however, clearly qualify for standing under our prior ruling.  Because they have standing, we have jurisdiction to proceed without the need to address any insufficiencies in the Barnes-Wallaces' standing. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943–44 (9th Cir. 2011) (en banc).

[9] We review de novo the district court's grant of summary judgment. *Olsen*, 363 F.3d at 922.

[10] We reject the plaintiffs' contention that the Boy Scouts waived any challenge to the district court's ruling on the California constitutional clauses by not arguing the issues in their opening brief.  The issues were adequately presented in conjunction with the federal constitutional issues.

The No Aid Clause prohibits the City from "mak[ing] an appropriation, or pay[ing] from any public fund whatever, or grant[ing] anything to or in aid of any religious sect, church, creed, or sectarian purpose . . . ." Cal. Const. art. XVI § 5.[11] We construed this provision in our en banc decision of *Paulson v. City of San Diego*, 294 F.3d 1124 (9th Cir. 2002) (en banc).[12]

More recently, the Supreme Court of California has construed the No Aid Clause in a case addressing the validity of a program under which a state entity authorized the issuance of state bonds to fund educational facilities at various educational institutions, including three that were assumed to be "pervasively sectarian." *Cal. Statewide Cmtys. Dev. Auth. v. All Persons Interested ("Statewide*

---

[11] The No Aid Clause is notably expansive and exhaustive. In relevant part it states:

> Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the State, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever . . . .

Cal. Const. art. XVI § 5.

[12] *Paulson* invalidated a sale by the City of San Diego of a plot of land in Mt. Soledad Natural Park that contained a large concrete Latin cross.

*Communities"*), 152 P.3d 1070 (Cal. 2007). This case, which was decided after the district court entered its summary judgment here, is crucial to our decision.

First, it is important to note that, despite the categorical language of the No Aid Clause, the California Supreme Court in *Statewide Communities* re-emphasized that the mere conferring of some benefit on a sectarian organization does not *ipso facto* violate the No Aid Clause. *Id.* at 1077. Instead, *Statewide Communities* enunciated a four-part test for determining whether aid – there, in the form of state bonding authority furnished to a pervasively sectarian institution – complies with the No Aid Clause:

> (1) The bond program must serve the public interest and provide no more than an incidental benefit to religion; (2) the program must be available to both secular and sectarian institutions on an equal basis; (3) the program must prohibit use of bond proceeds for "religious projects"; and (4) the program must not impose any financial burden on the government.

*Id.* at 1077. We apply a parallel analysis to that in *Statewide Communities* to the situation before us.

The *Statewide Communities* analysis makes it unnecessary to belabor two threshold issues: (1) whether the City's leases constitute "Aid" to the Scout defendants, and (2) if so, whether the Scout defendants are "sectarian" within the meaning of the No Aid Clause. *Statewide Communities* upheld a state program that clearly provided substantial benefits to a pervasively sectarian institution. We assume for

purposes of our decision, without deciding, that the City's leases confer a benefit on the Boy Scouts and that the Boy Scouts are a sectarian organization. We proceed, then, to consider whether the City's aid to the Scout defendants complies with the requirements set forth in *Statewide Communities*.

Like the California Supreme Court in *Statewide Communities*, we address factors (2), (3), and (4) of its test first before considering factor (1).

### 1. The City Made the Leases Available on an "Equal Basis."

The City's benefit to the Scout defendants must be available on an "equal basis" to those with religious and secular objectives. *See Statewide Communities*, 152 P.3d at 1077; *Paulson*, 294 F.3d at 1131. For example, we have held that an airport's policy of renting commercial space to religious organizations did not violate the No Aid Clause, in part, because "there is no suggestion that all religions did not have the same opportunity to rent space, or that groups with views opposed to organized religion, or with any other social or philosophical view, were denied that opportunity." *Christian Sci. Reading Room Jointly Maintained v. City & Cnty. of S. F.*, 784 F.2d 1010, 1014 (9th Cir. 1986). Similarly, the California Court of Appeal held that a long-term lease of land by a community college district to a synagogue did not violate the No Aid Clause, in part, because "religious and secular groups had equal opportunity to obtain the government benefit." *Woodland Hills Homeowners Org. v. L. A. Cmty. Coll. Dist.*, 266 Cal. Rptr. 767, 776 (Ct. App. 1990).

The district court (which did not have the benefit of *Statewide Communities* at the time it ruled) and the plaintiffs have taken the position that, in determining whether the benefit was equally available to others, the focus must be on the individual negotiation of the leases to the Boy Scouts. Not everyone, the plaintiffs argue, had an opportunity to lease the particular plots of land leased to the Boy Scouts. Therefore, the argument goes, there was no equal access of sectarian and secular entities to the properties.

This approach to the issue of the City's evenhandedness is too narrow, in our view. It is undisputed that the City has leased no less than 123 parcels of public property to all kinds of nonprofit organizations, most but not all of which were purely secular. The City's practice of leasing its lands is by no means occasional or targeted in favor of sectarian organizations; it is multifarious and clearly confers a similar benefit on both secular and religious organizations. It is true, as the district court pointed out, that there is no written specification uniformly governing all such leases. But in view of the numbers and nature of the leases disclosed by the record, we conclude that the City's leases were "available to both secular and sectarian institutions on an equal basis." *See Statewide Communities*, 152 P.3d at 1077.

### 2. The Leases Do Not Make City Funds Available for "Religious Projects."

*Statewide Communities* requires that a bonding program prohibit the "use of bond proceeds for 'religious projects.'" *Id.* at 1077–78. This requirement does not transfer easily to the context of the Boy Scouts leases, except in the literal sense that no City funds go for religious projects at either facility leased to the Boy Scouts because the City expends no

funds at all on the Boy Scouts or on the properties leased to them.

It is true that the land leased by the City may be used from time to time by the Boy Scouts for religious purposes. But at least two precedents make clear that such use does not run afoul of the No Aid Clause. *Christian Science Reading Room* and *Woodland Hills Homeowners* involved rental or leases of property on which religious activities, such as the devotional reading of Christian Science texts or synagogue services, undoubtedly occurred, but which were found not to violate the No Aid Clause. *See Christian Sci. Reading Room*, 784 F.2d at 1015–16; *Woodland Hills Homeowners*, 266 Cal. Rptr. at 774–76. Although these two decisions were issued before *Statewide Communities*, they were decided after *California Educational Facilities Authority v. Priest*, 526 P.2d 513 (Cal. 1974), on which *Statewide Communities* heavily relied. We therefore do not interpret this funding prohibition of *Statewide Communities* to invalidate governmental leases to organizations that may use the leased properties for religious purposes. *Statewide Communities* made it clear that the sectarian institutions involved in that case were entirely free to engage in religious exercise on the property funded with bond proceeds; the requirement of the No Aid Clause was simply that any funding received from the state bond program not be used specifically to finance "religious projects." We find no violation of that requirement here.

### 3.  The City's Leases Impose No Financial Burden on the City.

In *Statewide Communities*, the California Supreme Court held that the bond program at issue imposed no financial burden on the state because all costs were funded solely by the private purchasers of the bonds, there was no recourse against the state for any bonded liability, and any costs to the government of issuing the bonds were reimbursed by the schools.  *See* 152 P.3d at 1078.  Some tax revenues were eventually lost because of the tax-exempt status of the bonds, but such general tax policies had never been held to violate the No Aid Clause.  *Id.* at 1078 n.7.

It is clear that the City's leases to the Scout defendants do not require the City to accept a financial burden.  The City is neither obligated to pay, nor pays, any funds in connection with either of the leases at issue.  It is true that the City has granted long-term leases of valuable property at nominal or no rent, but it requires and receives the benefit of expensive improvement and management of the properties by the Boy Scouts.  Even if there is still a net benefit to the Boy Scouts, the City does not undertake a liability of the kind that *Statewide Communities* was guarding against.  We conclude that the leases are not a "financial burden" to the City within the meaning of *Statewide Communities*.[13]

---

[13] In their original briefing, the plaintiffs stated that the City's long-term leases for nominal or no rent violated the No Aid Clause provision forbidding the "grant or donation of . . . real estate . . . for any . . . sectarian purpose whatever."  Cal. Const. art. XVI § 5.  They did not further develop that argument, and we decline to address it.

### 4. The Benefits of the City's Leases to the Religious Purposes of the Scout Defendants Are Merely Incidental.

We address finally the first of the four mandatory requirements of *Statewide Communities* for viability of a government benefit under the No Aid Clause: the "program must serve the public interest and provide no more than an incidental benefit to religion." *See* 152 P.3d at 1077. There is no question that the City's leases serve the City's public purpose of encouraging nonprofit organizations to develop cultural, educational, and recreational programs and facilities for public use. The disputed question is whether the City's aid to the Scout defendants' religion is merely incidental to that public purpose. We conclude that the City's aid to the Scout defendants' religious purposes is incidental.

In *Statewide Communities*, the California Supreme Court held that a bond program's considerable benefit to religion was incidental so long as the sectarian schools offered a broad curriculum in secular subjects, and the schools' secular classes consisted of information and coursework that was neutral with respect to religion. *See id.* at 1079.

There is no dispute that the Scout defendants primarily provide camping, water sports, and other outdoor youth activities at Camp Balboa and the Youth Aquatic Center that are typical of a secular camp facility. Participation in and instruction in these activities are essentially neutral as to religion, and qualify as the equivalent of a "broad curriculum in secular subjects" that the California Supreme Court required of educational institutions to pass muster under the No Aid Clause. *Id.* at 1072. The Boy Scouts make these activities available both to their own members and to others

who apply to use the facilities.  The provision of those services for members and others is a legitimate secular interest of the City and is the City's main purpose in granting the leases.  Any aid to religion is "incidental" in the common meaning of that term.

It is also incidental in the legal sense of *Statewide Communities*.  It is true that we assume for purposes of decision that, in granting the leases for secular purposes, the City confers a benefit on the Boy Scouts, and that the Boy Scouts are a sectarian organization.  But the facts that the Scouts receive a benefit and are a religious organization do not by themselves amount to a violation of the No Aid Clause; the educational institutions that benefited quite considerably in *Statewide Communities* were assumed to be pervasively sectarian.  It is further true that, in teaching camping, outdoorsmanship, and aquatic activities, the Boy Scouts may express religious sentiments but, because the requirements of *Statewide Communities* are otherwise met, "the expression of a religious viewpoint in otherwise secular classes will provide a benefit to religion that is merely incidental to the . . . primary purpose of promoting secular education."  *Id.*  We conclude, therefore, that any benefit conferred on the religion of the Boy Scouts by the City's leases is "merely incidental" within the meaning of *Statewide Communities*.

Accordingly, because they meet all four requirements of *Statewide Communities,* the leases do not violate the No Aid Clause of the California Constitution.

## V.  The California No Preference and Establishment Clauses.

Article I, section 4 of the California Constitution provides: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. . . . The Legislature shall make no law respecting an establishment of religion."  The plaintiffs invoked both of these No Preference and Establishment Clauses in their complaint.

The California Supreme Court has held that the Establishment Clause of the California Constitution creates no broader protection against the establishment of religion than the Establishment Clause of the United States Constitution.  *E. Bay Asian Local Dev. Corp. v. California*, 13 P.3d 1122, 1138 (Cal. 2000).  That Court has further held that a governmental action that satisfies the test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), for permissibility under the federal Establishment Clause necessarily passes muster under the California No Preference Clause.  *E. Bay*, 13 P.3d at 1139.  Accordingly, we need not separately analyze the plaintiffs' claims under these state constitutional provisions because our disposition of this case requires us to address the plaintiffs' federal Establishment Clause claims.

## VI.     The Establishment Clause of the United States Constitution.

The district court held that the leases of Balboa Park and Fiesta Island to the Boy Scouts violated the federal Establishment Clause.  The primary reason paralleled the district court's reason for finding a violation of the state No Aid Clause: the leases were exclusively negotiated with the

Boy Scouts, and secular organizations were not given a full opportunity to negotiate leases for those particular lands.

As in the case of the state constitutional claims, we conclude that the district court gave insufficient weight to the fact that the City had leased portions of city lands to 123 nonprofit organizations, the great majority of which were secular in nature. *See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 704 (1994) (stating that the Supreme Court has "frequently relied explicitly on the general availability of any benefit provided religious groups or individuals in turning aside Establishment Clause challenges"). In light of that fact, and the other indications of the purpose and effect of the Boy Scouts' leases, we conclude that those leases did not violate the federal Establishment Clause.

The traditional test applied by the Supreme Court to determine whether governmental action violates the Establishment Clause was set forth in *Lemon*, 403 U.S. at 612–13. To be constitutional, the government conduct at issue must: (1) have a secular purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) not foster an excessive government entanglement with religion. *Id*. In *Agostini v. Felton*, 521 U.S. 203, 232–33 (1997), the Court placed a gloss on this formulation, stating that the factors used to determine the "effect" of a challenged action were similar to those used to determine whether there was an excessive entanglement.

The *Lemon* test has recently led a checkered existence. In two relatively recent Establishment Clause cases, the Supreme Court reached differing results under distinct tests of constitutionality. In *Van Orden v. Perry*, 545 U.S. 677

(2005), the Court held that the display of a monument inscribed with the Ten Commandments on the grounds of the Texas capitol did not violate the Establishment Clause. The plurality opinion stated that the *Lemon* test was "not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds." *Id.* at 686. Justice Breyer's concurring opinion also declined to apply the *Lemon* test. *Id.* at 703–04 (Breyer, J., concurring). On the other hand, in *McCreary County v. ACLU*, 545 U.S. 844 (2005), the Court held that the display of lone copies of the Ten Commandments on the walls of two courthouses violated the Establishment Clause because the placement of the displays clearly evidenced a religious purpose, thus failing the first prong of the *Lemon* test.

We subsequently discussed the impact of these cases in *Card v. City of Everett*, 520 F.3d 1009 (9th Cir. 2008). We came to two conclusions: (1) "that the three-part test set forth in *Lemon* and modified in *Agostini* remains the general rule for evaluating whether an Establishment Clause violation exists"; and (2) that the *Lemon* test does not apply "to determine the constitutionality of some longstanding plainly religious displays that convey a historical or secular message in a non-religious context." *Id.* at 1016. Because our case generally does not fit within this second category, we apply the *Lemon-Agostini* test.

In determining the purpose of a challenged governmental action, we adopt the viewpoint of an objective observer, *McCreary*, 545 U.S. at 862, familiar with the history of the practice at issue, *Newdow v. Rio Linda Union School District*, 597 F.3d 1007, 1037–38 (9th Cir. 2010). The result here is clear. There is no evidence that the City's purpose in leasing the subject properties to the Boy Scouts was to advance

religion, and there is abundant evidence that its purpose was to provide facilities and services for youth activities. Indeed, the plaintiffs do not seriously argue that the City's intentions were forbidden. The first prong of the *Lemon* test is satisfied.

In a combined *Agostini* approach to the second and third prongs of the *Lemon* test, we examine "(i) whether governmental aid results in government indoctrination; (ii) whether recipients of the aid are defined by reference to religion; and (iii) whether the aid creates excessive governmental entanglement with religion." *Card*, 520 F.3d at 1015.

We are satisfied that a reasonable observer familiar with San Diego's leasing practices, as well as with the events surrounding the leasing of Camp Balboa and the Aquatic Center and the actual administration of the leased properties, could not conclude that the City was engaged in religious indoctrination, or was defining aid recipients by reference to religion. The facts that the City has leased 123 parcels to nonprofit agencies, the overwhelming majority of which are secular in nature, and that 96 of those leases require no payment of rent (although in some cases there is a small administrative fee), tend to negate any indoctrination or distribution of aid by reference to religion.[14] Instead, they

---

[14] The plaintiffs invoke *Community House, Inc. v. City of Boise* (*Community House I*), 490 F.3d 1041 (9th Cir. 2007), in which we held that a $1-per-year lease of a homeless shelter to a religious organization that conducted religious indoctrination was sufficient to support a preliminary injunction as an Establishment Clause violation. Our later discussion in *Community House, Inc. v. City of Boise* (*Community House II*), 623 F.3d 945 (9th Cir. 2010), however, addressed the question whether such a subsidized lease *offered on the same rental terms as those offered to other nonprofit groups* would violate the Establishment Clause.

suggest that favorable City leases "are allocated on the basis of criteria that neither favor nor disfavor religion." *Agostini*, 521 U.S. at 232. Moreover, in the actual management of the leased properties, the City is not involved at all, and consequently cannot be seen to be involved or entangled in any religious activities of the Boy Scouts.[15]

We conclude, therefore, that the City's leases to the Boy Scouts do not violate the federal or California Establishment Clauses, or the California No Preference Clause.

---

We cited with approval a Fourth Circuit case, *Fairfax Covenant Church v. Fairfax County School Board.*, 17 F.3d 703 (4th Cir. 1994), that held it to be a violation of the Free Exercise and Free Speech Clauses to charge religious organizations commercial rental rates while charging other nonprofit organizations a subcommercial rent. 623 F.3d at 971. We then ruled that the defendants in *Community House* were entitled to qualified immunity because, *if it was* an Establishment Clause violation to charge a religious organization the same subsidized rental charged another nonprofit organization, the violation was not clearly established. *Id.* at 971–73. We do not regard the *Community House* cases as conflicting with our holding today.

[15] For the same reason, an objective observer familiar with the history of the City's leasing projects could not view the Boy Scouts leases as an "endorsement" of religion by the City. Nothing in the City's overall leasing policy can reasonably be regarded as "appearing to take a position on questions of religious belief or . . . 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 594 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring); *see also Newdow*, 597 F.3d at 1037–38.

## VII.     The State and Federal Equal Protection Clauses.

The plaintiffs' complaint alleged that the City's leases violated the federal and state Equal Protection Clauses "by endorsing, supporting, and promoting defendants' discrimination based on sexual orientation and religious non-belief in the provision of access to and use of leased public parklands."[16]  The district court did not address the merits of this claim because it had granted the plaintiffs relief under the state and federal religion clauses.  It accordingly dismissed the equal protection claims as moot.  The plaintiffs argue that, if their religious claims are denied here (as they are), the dismissal of the equal protection claims should be reversed, and the matter remanded to the district court for it to address those claims.  We agree that, by reason of our disposition of the other claims, the equal protection claims are no longer moot.  We conclude, however, that the plaintiffs cannot succeed on their equal protection claims, and we accordingly affirm the district court's dismissal of those claims.

"[I]n order for a state action to trigger equal protection review at all, that action must treat similarly situated persons disparately."  *Silveira v. Lockyer*, 312 F.3d 1052, 1088 (9th Cir. 2002), *abrogated on other grounds by District of Columbia v. Heller*, 554 U.S. 570 (2008).  The pleadings and declarations of the plaintiffs make it abundantly clear that they have never attempted to use the facilities and accordingly have not been treated differently from other members of the public (or indeed treated at all) with regard to

---

[16] With exceptions not relevant here, California treats the state and federal Equal Protection Clauses as embodying an identical guarantee. *See Connerly v. State Pers. Bd.*, 112 Cal. Rptr. 2d 5, 19 (Ct. App. 2001).

the leased properties, either by the City or by the Boy Scouts with the imprimatur of the City.

It is true that, in our earlier decision, we held that the plaintiffs had established sufficient "injury in fact" to create a case or controversy giving us Article III jurisdiction over their claims. *See Barnes-Wallace*, 530 F.3d at 785. That injury was a lack of access to Camp Balboa and the Aquatic Center because of the repugnance of the Boy Scouts' policies to the plaintiffs. While that "injury in fact" is sufficient to invoke our jurisdiction, it does not of its own weight establish the plaintiffs' entitlement to relief for a violation of the state and federal Equal Protection Clauses. "[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, th[e Supreme] Court has held that the plaintiff generally must assert his own legal rights and interests . . . ." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). A successful claim under the Equal Protection Clauses, unlike one under the Establishment Clause, requires the governmental actor to have discriminated against the plaintiff, in the absence of special circumstances permitting reliance on rights of third parties. *See Powers v. Ohio*, 499 U.S. 400, 410–11 (1991). Thus the plaintiffs here must show that the City, or the Boy Scouts with the City's imprimatur, treated the plaintiffs differently from some other individuals. This they have failed to do.

The plaintiffs contend, however, that they are treated less favorably than others because members of the Boy Scouts, which they cannot join, have preferential access to the leased properties. It is of course true that, when the government imposes a discriminatory barrier making it more difficult for members of a group to obtain a benefit (such as a government contract), the injury of unequal opportunity to compete

confers standing. *See Ne. Fla. Chap. of the Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But a plaintiff seeking to challenge such a barrier must "demonstrate that it is able and ready to bid on contracts." *Id.* The plaintiffs here are not able and ready to apply for access to Camp Balboa and the Aquatic Center because the membership policies of the Boy Scouts make it repugnant for the plaintiffs to apply to any facility operated by them.

Indeed, we addressed this claim of the plaintiffs in our earlier decision, in a passage that bears repeating. We said:

> Nor can the plaintiffs claim standing on the basis of the Council's policy of granting preferential access to the Boy Scouts. Even if the Council excludes other groups in favor of the Boy Scouts – a disputed fact here – the plaintiffs cannot show injury from this policy. The plaintiffs have insisted that they would not use the facilities while the Boy Scouts are lessees. The plaintiffs never contacted the Boy Scouts about using the facilities, and they admitted they knew little or nothing about the Boy Scouts' policies regarding access to the facilities. Without any plans to apply for access, the plaintiffs cannot show actual and imminent injury from a discriminatory policy of denying access. *See Lujan*, 504 U.S. at 564.

> Moreover, the injury that we have concluded the plaintiffs *did* suffer cannot be redressed by correcting this access policy. As long as the Council as an organization

maintains policies that exclude from participation and demean people in the plaintiffs' position, no amount of evenhanded access to the leased facilities will redress the plaintiffs' injury: emotional and recreational harm arising out of the Council's control and administration of public land that the plaintiffs wish to use. It is this injury, and not the alleged Boy Scouts' policy of preferential access to the facilities it operates, that supports plaintiffs' standing . . . under the federal and state religion clauses.

*Barnes-Wallace*, 530 F.3d at 787 (footnote omitted).

We conclude, therefore, that the plaintiffs have failed to show a violation of the federal or state Equal Protection Clauses.

### VIII.   The San Diego Human Dignity Ordinance.

The Barnes-Wallaces challenge the district court's dismissal of their claim under the San Diego Human Dignity Ordinance. The Ordinance makes it unlawful for any person to discriminate in the availability of City facilities or facilities supported by the City on the basis of an individual's sexual orientation or gender identity. San Diego Mun. Code § 52.9606(a)(1), (3).

For essentially the same reason just discussed with regard to the equal protection issue, the Barnes-Wallaces cannot establish a viable claim for relief under the Human Dignity Ordinance. That ordinance forbids discriminating against individuals using city-supported facilities on the basis of

sexual orientation and provides relief to persons "aggrieved" by the failure to provide such access. *See id.* § 52.9609(a). As we have explained, the Barnes-Wallaces never attempted to use the Camp Balboa or Aquatic Center Facilities, and accordingly suffered no discrimination in a denial of those services. They thus have not alleged any violation of the Ordinance affecting them. The district court did not err in dismissing their claim.

## IX.     The Breach of Contract Claim.

The City's lease for Camp Balboa contained the following clause:

> 7.4 *Nondiscrimination*. LESSEE agrees not to discriminate in any manner against any person or persons on account of race, color, religion, gender, sexual orientation, medical status, national origin, age, marital status, or physical disability in LESSEE'S use of the premises, including but not limited to the providing of goods, services, facilities, privileges, advantages, and accommodations, and the obtaining and holding of employment.

The lease for the Aquatic Center contains an identical provision except that it omits "sexual orientation" and "medical status" in the list of prohibited grounds of discrimination. The plaintiffs contend that the Boy Scouts breached these provisions, and that they are entitled to sue to require enforcement.

We assume for purposes of decision, without deciding, that the plaintiffs can qualify as third-party beneficiaries of

the nondiscrimination clauses in the two leases.  *See Lucas v. Bechtel Corp.*, 800 F.2d 839, 848 (9th Cir. 1986) (assuming, without deciding, that a third party was the intended beneficiary of a contract governed by the Labor-Management Relations Act).[17]  On the merits, however, the plaintiffs have utterly failed to present a viable claim of breach of contract. The plaintiffs never attempted to use any of the facilities of Camp Balboa or the Aquatic Center.  The Boy Scouts consequently were never given an opportunity to perform or to breach any contractual duty to *these plaintiffs*.  The district court accordingly did not err in dismissing the contract claims.

## X.  Conclusion

The district court erred in ruling that the City's leases with the Boy Scouts violated the California No Aid Clause, the California No Preference Clause, and the federal Establishment Clause.  The summary judgment in favor of the plaintiffs on these claims is reversed, and the matter is remanded to the district court with instructions to enter summary judgment in favor of the Scout defendants on these claims.

The district court's dismissal of the plaintiffs' state and federal equal protection claims is affirmed on the ground that the plaintiffs lack standing to maintain those claims.

---

[17] The district court held that the plaintiffs could not sue as third party beneficiaries of the lease provisions.  We do not address this issue because the plaintiffs' contractual claims so clearly fail on the merits.

The rulings of the district court dismissing the plaintiffs' claims for violation of the San Diego Human Rights ordinance and for breach of contract are affirmed.

**AFFIRMED in part; REVERSED in part; and REMANDED with instructions.**

---

KLEINFELD, Circuit Judge, concurring:

I join the majority opinion. I write separately only to note that we erred in the previous opinion (by which we are now bound) addressing standing. The plaintiffs allege absolutely no cognizable harm to themselves. They simply have a preference. The plaintiffs' views about the Boy Scouts' institutional positions do not establish standing, because no concrete harm flows to plaintiffs as a result of the Boy Scouts' views. My views on standing were set forth in my dissent in *Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 794 (9th Cir. 2008) (Kleinfeld, J., dissenting). Revulsion for a group so intense that one cannot bear to be on property they manage cannot, in a tolerant society, be deemed harm sufficiently concrete as to confer standing to sue.